UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Crystal Boone<br>Rt. 2, Box 243<br>Horse Shoe Run, WV 26716,<br><br>And<br><br>Melissa Harris<br>1712 South Davis Avenue<br>Elkins, WV 26241,<br><br>And<br><br>Charles Barker<br>Rt. 2, Box 273-1<br>Horse Shoe Run, WV 26716,<br><br>And<br><br>Holly Smith<br>Rt. 2, Box 273-1<br>Horse Shoe Run, WV 26716,<br><br>Plaintiffs,<br><br>v.<br><br>Mountainmade Foundation<br>    A non-profit Corporation<br>100 Front Street Circle<br>Thomas, WV 26292,<br><br>Serve: Mark Kessler<br>        Register Agent<br>        100 Front St. Circle<br>        Thomas, WV 26292,<br><br>And<br><br>Kate McComas<br>185 Rutledge Road<br>Charleston, WV 26292, | Case No.___<br><br><br>**Demand Jury Trial** |

|                                        |     |
|----------------------------------------|-----|
| And                                    | )   |
|                                        | )   |
|                                        | )   |
| Jack R. Carpenter                      | )   |
| WHTC                                   | )   |
| 2001 Main Street, Suite 400            | )   |
| Wheeling, WV 26003,                    | )   |
|                                        | )   |
| <u>Defendants.</u>                     | )   |
|                                        | )   |

## COMPLAINT

(Action For Damages Under the False Claims Act and State Law)

### I. <u>Introduction</u>

1.      This is an action to recover damages relative in the first instance to Plaintiffs'

efforts on behalf of the United States of America to recover money obtained by false statements

based on claims made and presented by the Defendants, their agents, and employees. Plaintiffs

seek damages for retaliation against Plaintiffs by Defendants because Plaintiffs "blew the

whistle" on Government fraud.  Plaintiffs reported fraud to MountainMade's accounting firm,

which instructed disclosure to the Board of Directors.  Plaintiffs reported the fraud to the Board

of Directors orally and in writing in March 2006.  MountainMade went into damage control

mode.  MountainMade protected Ms. McComas who misappropriated the funds. In May 2006,

MountainMade hired Ms. Nancy Leonard, a Professor of Management at West Virginia

University, as a consultant under a contract that netted her more than $20,000. Ms. Leonard was

on site for at least six weeks and attended the June 21, 2006. She a front for the retaliation.

Within months, MountainMade isolated the four Plaintiffs and implemented a coverup through

the Ms. Leonard and others.  On June 21, 2006, MountainMade openly demoted the four in

furtherance of its wrongdoing and in violation of federal law.  By January 2007, the Plaintiffs had

been fired or driven out of MountainMade.

2.      Under this Complaint, based on information and belief, Plaintiffs allege that Defendants MountainMade Foundation, Chairman of the Board Jack R. Carpenter and the former President of MountainMade, Kate McComas, engaged in conduct that was a fraud on the United States Government ("Government"), in the course of the grant funding activities before the U.S. Small Business Administration ("SBA") in Washington, D.C. that took place before that agency in the District of Columbia. MountainMade has been the recipient of grants under federal legislation through a process known as earmarks. Under this Complaint, Plaintiffs allege that MountainMade made false, fraudulent and intentionally misleading statements and submissions to the SBA while knowing and having reason to know that, because of Ms. McComas, those statements and submissions were false, exaggerated, inaccurate, and misleading, and that MountainMade was ineligible to request and receive such federal funds. In violation of their duty to report known errors resulting in the unwarranted federal payments, Defendants MountainMade and Ms. McComas, and based on information and belief, Mr. Carpenter, concealed the true facts and circumstances from agents of the Government. In reprisal, Defendants boldly and brazenly openly carried out a plan of blatant retaliation against whistleblowers though protected by federal law, and though prohibited by a so-called internal MountainMade policy against retaliation. The Plaintiffs are former officers, managers and employees of MountainMade.

3.      Plaintiffs invoke the whistleblower provisions of the federal Civil False Claims Act. Under this statute, it is unlawful for any person to knowingly submit, or cause to submit, a false or fraudulent claim to the Government for payment or approval. This statute subjects a violator to liability for a civil penalty of up to $10,000 for each false claim submitted or paid,

plus three (3) times the amount of the damages sustained by the Government. A person incurs

liability both the person knowingly seeks payment that is unwarranted and when false records or

statements are knowingly created or caused to be used to conceal, avoid, or decrease an

obligation to pay or transmit money. Plaintiffs are persons having information regarding false or

fraudulent claims against the United States.

## II.  **Jurisdiction & Venue**

4.      Plaintiffs bring this action under the Civil False Claims Act, 31 U.S.C. § 3729 et

seq., and state law.

5.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

§ 1331 (federal question) and under 31 U.S.C. § 3732 (jurisdictional provisions of the Civil False

Claims Act and 31 U.S.C. §§ 3729, 3730). Plaintiffs also invoke this Court's jurisdiction under

28 U.S.C. § 1667 (supplemental jurisdiction).

6.      This Court has personal jurisdiction over the non-resident Defendants under the

District of Columbia long-arm statute because the requisite requirements of due process are

satisfied. *See* D.C. Code § 13-423 (authorizing exercise of personal jurisdiction to the fullest

extent permissible under the Due Process Clause of the Constitution); *see also*, Fed. R. Civ. R.

4(k). Defendants MountainMade and McComas are residents of West Virginia. Defendant

Carpenter is a resident of Ohio. Acts in furtherance of a scheme and artifice to defraud were

carried out and perfected in the District of Columbia. Venue is proper in the U. S. District Court

for the District of Columbia under 28 U.S.C. § 1391(b) and (c) because false submissions and

representations took place in the District of Columbia before the SBA. False submissions

prepared outside the jurisdiction were sent by overnight mail and otherwise delivered into this

jurisdiction, where they were received, reviewed , considered, acted upon and funding decisions ultimately made. Federal funds were disbursed each fiscal year on a quarterly basis.

### III. **Parties**

Plaintiffs

7.      Plaintiff Crystal Boone is a resident of Horse Shoe Run, West Virginia. Her legal name was Crystal Roth prior to her marriage on June 9, 2007.  Her street address is Route 2, Box 243, Horse Shoe Run, West Virginia, 26716.  She is a former officer and employee of MountainMade. Mrs. Boone brings this action under 31 U.S.C. § 3730 (b)[1]for retaliation including constructive discharge. She has personal knowledge of the false records, statements and claims presented to the Government by and for Defendants. She was promoted to V.P. Finance by Defendant McComas four months before she blew the whistle.

8.      Plaintiff Melissa Harris is a resident of Elkins, West Virginia. Her address is 1712 South Davis Avenue, Elkins, West Virginia, 26241. She is a former employee of MountainMade. She brings this action under 31 U.S.C. § 3730 (b)[1] for retaliation including termination. She has personal knowledge of the false records, statements and claims presented to the Government by and for Defendants.

9.      Plaintiff Holly Smith is a resident of Horse Shoe Run, West Virginia. Her address is Route 2, Box 273-1, Horse Shoe Run, West Virginia, 26716.  She is a former employee of MountainMade.  She is the wife of Charles Barker.  She brings this action under 31 U.S.C. § 3730 (b)[1] for retaliation including termination. She has personal knowledge of the false records, statements and claims presented to the Government by and for Defendants.

10.     Plaintiff Charles Barker resides at Horse Shoe Run, West Virginia, and he is a former employee of MountainMade. His address is Route 2, Box 273-1, Horse Shoe Run, West Virginia, 26716. He brings this action under 31 U.S.C. § 3730 (b)[1] for retaliation including termination. He has personal knowledge of the false records, statements and claims presented to the Government by and for Defendants.

Defendants

11.     Defendant MountainMade is a non-member, nonprofit corporation formed under West Virginia law, having its principal place of business in Thomas, West Virginia.

12.     Defendant Kate McComas is a resident of Charleston, West Virginia, and at all times relevant here, was the President and Executive Director of MountainMade. She is sued in both her personal and representative capacity under allegations plead herein with specificity.

13.     Defendant Jack R. Carpenter is a resident of Stubenville, Ohio, and at all times relevant here, was Chairman of the Board of Directors of MountainMade. He is sued in both his personal and representative capacity under allegations plead herein with specificity.

Others Related to Defendants

14.     Laura Kurtz Kuhns is a resident of Fairmont, West Virginia, and at all times relevant here, was a member of the Board of Directors of MountainMade. Kuhns was also a member of the Board of Directors of the Institute for Scientific Research and the California-based National Housing Development Corporation. She was the President and Chief Operating Officer of Vandalia Heritage Foundation.

15.     Elizabeth W. Hall is a resident of Pittsburgh, Pennsylvania, and at all times relevant here, was a member of the Board of Directors and Secretary of MountainMade. She had

been the Chief of Staff to Congressman Alan Mollohan.

16.    Dale McBride is a resident of West Virginia and at all times relevant here, was a member of the Board of Directors of MountainMade. He was also the owner of FMW Composites.

17.    The accountants to MountainMade during and after the period in question were John Burdette & Associates, which is located in Buckhannon, West Virginia, and Toothman Rice, which has an office in Bridgeport, West Virginia. A professor from West Virginia University, Nancy Leonard, served an important role. Ms. Leonard, with the participation and approval of Ms. McComas, used harsh and explicitly threatening language and tactics to expressly punish, demoralize and humiliate Plaintiffs in the weeks and months immediately following Mr. Carpenter's April 6, 2006, letter that they need not worry about retaliation. Another key operative added to the retaliation effort was Mark Kessler, who fronted for the retaliators as a newly hired manager.

## IV. **Factual Allegations**

### Formation of MountainMade

18.    MountainMade was formed on June 7, 2001, under the law of West Virginia and obtained federal tax exempt status under I. R. C. § 501(c)(3). Under its Articles of Incorporation, MountainMade is authorized to support the regional art community and preserve and advance the arts through support, training and education of West Virginia artists and craft persons; to expand participation in the arts regionally; to provide information, training and education to artists, craft persons, and the community in areas such as e-commerce, technology and business; to provide public access to internet and computer technology in the community; to create an environment

promoting the growth of heritage arts and crafts in West Virginia using technology and other means; and to promote the economic well-being and contribute to the social welfare of areas in West Virginia through these means.

Officers and Directors of MountainMade

19.    As of June 7, 2001, the five-member initial Board of Directors and officers of MountainMade were (1) Barbara Mollohan, Director; (2) Jack Carpenter, Chairman; (3) Laura Kurtz Kuhns, Director; (4) Elizabeth Hall, Director; (5) Pamela Grandstaff, Director.

20.    As of October 31, 2001, the five-member Board of Directors and officers of Mountainmade were (1) Jack Carpenter, Chairman; (2) Laura Kurtz Kuhns, Director; (3) Elizabeth Hall, Director; (4) Pamela Grandstaff, Director and President; (5) Diane Strader, Secretary.

21.    MountainMade opened and has maintained bank accounts at Miners and Merchants Bank in Thomas, Huntington Bank in Elkins, and Grant County Bank in Davis, West Virginia. Any withdrawal of $2,500 or more requires two signatories under MountainMade's self-imposed procedures.

22.    As of June 2004, the Board of Directors and officers of MountainMade under IRS disclosures, for the period beginning July 1, 2003, and ending June 30, 2004, were (1) Jack Carpenter, Chairman; (2) Laura Kurtz Kuhns, Director; (3) Elizabeth W. Hall, Secretary; (4) Kate McComas, Executive Director and President; (5) Dale McBride, Director; and (6) Crystal Roth [now Boone], Treasurer. Plaintiff Mrs. Boone had been a claimed officer of the corporation during that period.

23.    As of September 30, 2005, the Board of Directors and officers of MountainMade

disclosed in the annul report filed with the State of West Virginia for the period April 8, 2005 through September 30, 2005, were (1) Jack Carpenter, President; (2) Elizabeth W. Hall, Secretary; (3) Kate McComas, Director.

24.    MountainMade hired foils to carry out the retaliation against the whistleblower activities made directly to Toothman Rice in early March 2006 and its Board of Directors in March after disclosures to Toothman Rice. They were Nancy Leonard, a purported consultant in May and Mark Kessler as the new General Manager in July 2006.  With the approval of its Board of Directors, and under the direction of Defendant Jack Carpenter, McComas was given free hand to attack, humiliate and terminate the Plaintiffs.  To do so, MountainMade relied on Leonard as consultant and Kessler as General Manager to carry out unlawful acts against Plaintiffs because of their whistle blowing activities.

Vandalia Heritage Foundation

25.    Vandalia Heritage Foundation ("Vandalia") is a West Virginia nonprofit corporation engaged in the business of  restoring historic buildings for use by community and economic development organizations. It owns more than 10 properties in northern West Virginia.

26.    In 1999, Vandalia purchased and renovated a building in Thomas that had been used for retail purposes, which is known as the Buxton & Landstreet Building.

27.    MountainMade was one of two tenants that had been leasing retail space from Vandalia.

28.    Canaan Valley Institute is a West Virginia non-profit corporation that is the other tenant. Its disclosed purpose is to assist communities in improving their water quality and address problems of wastewater.

Crystal Boone

29.    Mrs. Boone was hired by MountainMade on June 1, 2004, as Manager of the Country Store at an annual salary of $22,000.

30.    In April 2005, Ms. McComas promoted Mrs. Boone to Finance Manager and increased her annual salary to $30,000.

31.    In September 2005, Ms. McComas increased Mrs. Boone's annual salary to $35,000, and told Mrs. Boone that her work was excellent. Ms. McComas also promoted her to Director of Finance.

32.    Mrs. Boone's job duties in both the Finance Manager and Director of Finance positions involved bookkeeping functions, which included preparing payroll documentation, completing accounts payable transactions, reconciling bank statements, making bank deposits, reconciling transactions recorded at the three retail cash registers, posting receipts and disbursements to the chart of accounts. Mrs. Boone spread costs to expense categories under the chart of accounts based on uses of the debit card. Ms. McComas had sole control of the sole debit card.

33.    MountainMade maintained accounts at three banks during the relevant time period. Mrs. Boone prepared quarterly payroll tax filings and Ms. McComas signed the filings in her capacity as an officer of MountainMade. Mrs. Boone prepared W-2s, W-4s and 1099s and Ms. McComas would sign such forms as needed. Mrs. Boone also prepared the monthly West Virginia sales tax filings. If a signature was needed, Ms. McComas signed on behalf of the corporation. The same was true of the SBA quarterly submissions to obtain federal grant funds.

34.    While Mrs. Boone's background, experience, and education approached those of

a full-charge bookkeeper, MountainMade retained a certified public accounting firm for tax and accounting advise. The firm was Toothman Rice LLP, with an office in Fairmont, West Virginia. William Philips is the firm's CPA who regularly serviced the MountainMade account and with whom Mrs. Boone had regular dealings.

35.     On a regular basis, Mrs. Boone generated monthly profit and loss statements from QuickBooks software.  A paper copy of the monthly profit and loss statement was preserved by Mrs. Boone in a loose-leaf binder and a copy was delivered to Ms. McComas.  Ms. McComas and Mrs. Boone were located in the same building but had separate offices.

36.     Mrs. Boone was transferred into an accounting and bookkeeping position in April 2005 because the position came open when Pamela Corey left MountainMade. When Mrs. Boone was first hired by MountainMade in June 2004, the position was not available. In April 2005, the bookkeeping and accounting affairs of MountainMade were in disarray.  Ms. Corey's duties included generating monthly profit and loss statements. Ms. Corey provided financial data to Ms. McComas who in turn prepared the quarterly grant funding forms for submission to the SBA, and Ms. McComas signed SBA submissions on behalf of MountainMade. By comparison, Mrs. Boone prepared monthly financial statements but in addition generated the SBA form manually. Ms. McComas would review Mrs. Boone's draft form and signed on behalf of MountainMade. The form was then sent overnight UPS to the SBA.

37.     Based on information and belief, Ms. Corey had discovered financial irregularities involving Ms. McComas. Based on information and belief, Ms. Corey had challenged Ms. McComas about the irregularities involving the debit card and she was subsequently released. The debit card functions as an automatic deduction from a bank account.

The debit transactions would show up in a matter of days on the official records of the bank and the bank account. The records of the bank showed the transactions. The bank issued statements on a monthly basis. The statements itemized the usage. The bank provided hard copy of the monthly statements to MountainMade. Once the hard copy statement was received, it was processed internally by delivery to the bookkeeper functionary. The practice during Mrs. Boone's tenure, was delivery to her and, in turn, for her to physically deliver the envelope containing the statement to Ms. McComas and for Ms. McComas to open the envelope. Ms. McComas would initial the enclosure and return it to Mrs. Boone, under an internal anti-fraud procedure. Ms. McComas, however, routinely failed to examine the enclosure.

38.    Upon taking up the bookkeeping functions in April 2005, Mrs. Boone discovered that there had been no reconciliation of statements issued by the bank for the debit card usages covering an extended period dating back to at least April 2004. Mrs. Boone concluded that the nature of extent of internal bookkeeping neglect could have gone back further.

39.    At all times relevant here, Ms. McComas was the only person who had possession custody or control over the debit card. And there was but one debit card.

40.    When Mrs. Boone initially reviewed the debit card statements, she determined that there were usages that appeared improper on their face and many that could not be explained.

41.    Based on the irregularities in debit card usages, Mrs. Boone requested necessary explanations and justifications from Ms. McComas. The bank also made the debit card usages available on-line. Mrs. Boone first discovered the irregularities from an on-line review.

Discovery of Misappropriation

42.     The discovery occurred in September 2005. That triggered Mrs. Boone's attention, because these was not legitimate business purpose in purchases of merchandise from a woman's apparel store in New York City. During the relevant time period, Ms. McComas had been on travel. That disclosure caused Mrs. Boone to call Ms. McComas by phone. And when questioned, Ms. McComas admitted to personal use of the card but explained that she needed an outfit to wear while on travel.

43.     Once confronted by Mrs. Boone, Ms. McComas explained the incident and said she would repay MountainMade.

44.     This incident led Mrs. Boone to look further into the debit card usages. She went through statements that covered the period from April through September 2005, and highlighted those transactions on their face questionable. She went to Ms. McComas and asked her to provide justifications and documentation for all the highlighted transactions covering the six month period.

45.     Among the many improper charges were card usages at the women's stores of Eileen Fisher for $1,162.85 and Camper for $151.34 on September 26, 2005, for a total of more than $1,450. To repay these amounts, Ms. McComas instructed Mrs. Boone to initiate a deduction procedure on the payroll system that would payback MountainMade at the rate of $150 each month. Repayment was completed.

46.     By early 2006, Mrs. Boone's internal investigation took another step. In early 2006, Mrs. Boone met with MountainMade's certified public accounting firm, Toothman Rice, in its Bridgeport, West Virginia office. There the nature and scope of the internal fraud was

disclosed to Mr. Phillips. Additionally, in early 2006, she documented the troubling transactions that were readily apparent by preparing a spreadsheet on Excel software showing each transaction. She provided the spreadsheet to Ms. McComas. The spreadsheet detailed the plainly questionable card usages for the period beginning April 2005.

47.    Further inquiry by Mrs. Boone led to information that the previous bookkeeper also found questionable usages which dated back to at least April 2004.

48.    In addition, Mrs. Boone learned that Ms. Corey's predecessor, Susan Odell, had similar concerns that could have dated back to April 2002.

49.    By March 2006, Mrs. Boone had concluded that, among other things, Ms. McComas misappropriated MountainMade funds, which had as their source the United States Treasury through SBA grants, through the debit card from April 2005 through mid-March 2006; had similarly engaged in such improprieties during the period from the prior year of April 2004 to April 2005; had possibly engaged in such conduct from the time she was appointed Director of MountainMade in October 2003; repeatedly thwarted Mrs. Boone in her many attempts to obtain full and complete disclosure, explanation and documentation of these uses of the operating account; rebuffed the blunt demands of Mrs. Boone for an accounting based on the Excel spreadsheet; and managed to misappropriate more than $12,000 just based on the spreadsheet.

50.    In February 2006, Ms. Smith accompanied Ms. McComas on a business trip for MountainMade. The first leg of the trip involved driving to Baltimore, Maryland to attend a wholesale art show. They departed on February 27, 2006, and returned on March 2, 2006. Using the debit card, Ms. McComas made a number of purchases that included art and clothing that

were intended and put to personal use. They stayed overnight in Baltimore. The next day they

drove to Brattleboro, Vermont. From that spot they returned by car directly to Thomas. While in

Brattleboro, they visited the Vermont Country Store and at that time Ms. McComas used the

debit card to make purchases for her personal use. The items included women's clothing. The

incidents were alarming to Ms. Smith. In a long distance call to her husband, she discussed what

she had seen. On this trip, Ms. McComas had made purchases of personal items amounting to at

least several hundred dollars and had run up charges with the card that were more than $9,000.

Full Disclosure to Toothman Rice

51.    In March 2006, Mrs. Boone had a meeting with Mr. Phillips at Toothman Rice's

Bridgeport, West Virginia office. In that meeting she took up with Mr. Phillips ongoing

accounting matters of Mountainmade and specifically the improprieties involving debit card. Her

disclosures were explicit and based on her first-hand information. She told him that Ms.

McComas had refused to provide an accounting, explanation and documentation of the usages.

Mr. Phillips took no action and expressly declined to do so. He told her that there was nothing he

could do to intervene. He declined to assist her. He did not offer to report the matter to the Board

of Directors or challenge Mrs. McComas himself. Instead Toothman Rice directed Mrs. Boone

to report her findings to the Board of Directors herself and told her that if she did not do so, that

she would be seen as having engaged in unlawful activity.

52.    Material facts constituting internal fraud and misuse of Government funds were

disclosed to Toothman Rice by Mrs. Boone. But it declined to take action itself directly with

MountainMade and its Board of Directors. Toothman Rice continues to act as the certified public

accountants of MountainMade, and obviously does so at the pleasure of the Board of Directors.

At the time, it was operating under a retainer agreement that has been renewed each year. Toothman Rice had knowledge as of that date that Ms. McComas obstructed the internal audit and investigation and sufficient information to act in furtherance of its fiduciary duty to MountainMade. Its failure to do so was tantamount to acquiesce in past misdeeds and ratification of improprieties to occur in the future that involved an officer of the corporation.

53.     John Burdette & Associates is a certified public accounting firm in West Virginia. During the period 2005, it was the auditor for MountainMade and prepared its audited financial statements. The auditor during a prolonged previous period was Toothman Rice. In 2005 and thereafter, MountainMade employed two accounting firms: John Burdette & Associates and Toothman Rice.

54.     During John Burdette's on-site audit of the financial records of MountainMade in mid- 2005, Mrs. Boone explained to him that she had been unable to reconcile the debit card statements and usages for the audit period which was July 2003 to June 2004. He instructed her to find categories under the chart of accounts and simply insert the data. When the onsite audit was undertaken in 2005, all expenses were simply posted, which ignored the reality of the expenditures.

55.     Following the disclosures to the Board of Directors, John Burdette came on site to prepare the audit for the fiscal year ending June 2005 sometime in April 2006. She provided John Burdette with reconciliations for the debit card covering the audit period, however, the reconciliation was based on undocumented information from Ms. McComas, and it in return was restricted to the Excel spreadsheet. Mrs. Boone posted the item to a category in the chart of accounts. Ms. McComas was to repay amounts and those repayment schedules were entered in

the Quickbooks software -- but the repayments did not cover all amounts Mrs. Boone had

challenged because the Board of Directors left it up to Ms. McComas to decide those that were

personal and those that were not, without supporting documentation.

Disclosures to the Board of Directors

56.    On March 23, 2006, there was a meeting of the Board of Directors.

57.    Prior to the Board of Directors meeting, Mrs. Boone sent by overnight delivery

to Jack Carpenter four letters written by each of the Plaintiffs, plus the Excel spreadsheet. Mrs.

Boone addressed her letter to "Jack, Dale and Peter." The letter details wrongdoing. Prior to the

Board of Directors meeting, Mrs. Boone met with the following three persons:

Mr. Carpenter; outside counsel for MountainMade who regularly attends board meetings; and

Mr. McBride. They met for about one hour.  During this meeting, Mrs. Boone recounted the

incidents of fraud. The three asked questions and she answered the questions. No minutes were

prepared during this meeting and to her knowledge, there is no recording of statements made

during the meeting.  Each of the three had the Excel spreadsheet and Plaintiffs' letters.

58.    The Board of Directors meeting took place after Mrs. Boone's meeting with the

three, and it lasted two hours. Mrs. Boone prepared minutes at this meeting as she had in the past.

Mrs. Boone had attended board meetings since she took over the bookkeeping functions and at

the outset was assistant to secretary. She prepared board meeting minutes. She was present

throughout the meeting. A member of Congressman Mollohan's staff routinely attended board

meetings.  Those also in attendance were Defendant Carpenter, Dale McBride, Laura Kuhns, Ms.

McComas, MountainMade' counsel, and Amy Tomer (the Congressman's staff member). She

was not asked to speak or explain the allegations.

59.     Following the board meeting, McComas resigned, the board invited her back, and she thereupon spearheaded MountainMade's retaliation and coverup with a vengeance. And indeed she was vengeful in her statements and actions against Plaintiffs. That was mirrored as well by Ms. Leonard. After the Board of Directors meeting, Ms. McComas was to review the 35 transactions identified on the Excel spreadsheet by Mrs. Boone. Based on information and belief, there was no internal audit and MountainMade never looked behind the 35 items. Instead it relied on Ms. McComas's say so. It did not require her to proffer documentation to support the items. And in this process, Ms. McComas admitted to only two improper transactions. The board sanctioned the misconduct by entrusting the investigation and the decisions to the wrongdoer.

60.     The SBA submissions to obtain Government funds employed numbers and information that MountainMade knew were false to the extent at least of the debit card fraud. The quarterly submissions over a period of years amount to many false statements. Mrs. Boone has first knowledge of many submissions. The false information and amounts certainly exceed the amount on the Excel spreadsheet of about $12,000. Data on the costs of the company car, entertainment for personal purposes, cell phone usage, utilities in Ms. McComas's house and Ms. McComas working 20 hours a week rather than full time, and other expenses were false.

61.     On January 1, 2006, Mrs. Boone received a performance evaluation – the only performance evaluation she received while employed at MountainMade – and was made Vice President of Finance and her salary increased to $40,000. Based on a performance evaluation of 5, Crystal received a 7 - - outstanding; surpassing all expectations.

62.     On April 5, 2006, Jack Carpenter, as Chairman of the Board of Directors of MountainMade, confirmed by letter dated April 5, 2006, that Mrs. Boone made disclosures to the

Board of Directors.

63.    On June 21, 2006, Mrs. Boone was demoted – her title reverted to

Finance Manager.  Her title of V.P. Finance was taken from her.

64.    Mrs. Boone had key job duties taken from her. She was stripped of duties relating

to human resources. Her name was removed as a signatory to the checking account. She was also

told that she would no longer be in a position where she could make judgment calls for

MountainMade and that she was not to have direct contact with Ms. McComas.

Melissa Harris

65.    In August 2003, Ms. Harris was hired as a part-time Customer Service

Representative for MountainMade by Pamela Grandstaff at an hourly rate of $8.00.

66.    In October 2003, Ms. Harris was given full-time hours and benefits by Ms.

McComas, with a pay increase to $9.00 per hour.

67.    In August 2004, Ms. Harris received another pay raise by Ms. McComas to

$10.00 per hour. In November 2004, at annual evaluations, Ms. Harris received a pay raise to

$10.50 and was given an evaluation score of 5 (outstanding and surpassing all expectations).

68.    Around January or February 2005, Ms. Harris was promoted to Executive

Assistant to the Executive Director, Ms. McComas; for three days per week, with her pay

increased to $11.00 per hour. Ms. Harris was however, to remain working as a Customer Service

Representative on a part-time basis, as needed, so as to maintain her full-time work status.

69.    In February 2005, Ms. Harris started noticing receipts for personal items

purchased by Ms. McComas.

70.    In October 2005, at the grand opening of the MountainMade Studios, Ms. Harris

received a special thanks from Ms. McComas during her speech, for the great work she had done on the studios and as her Executive Assistant.

71.     In December 2005, Ms. Harris told Ms. McComas that she would like to return to college. Ms. McComas told her that she can keep working as her Assistant on a part-time basis, and that MountainMade would work around her class schedule.

72.     In December 2005, during Ms. Harris' annual evaluation, Ms. McComas told her that she could not offer her a pay raise because she was going part-time, and part-time employees were not receiving raises. Other part-time employees did receive "cost of living" raises as well as full-time employees.

73.     In January 2006, Ms. Harris returned to college. Ms. McComas told her that as long as she worked 20 hours per week, she could keep her benefits. Ms. Harris then worked twice a week (Tuesday and Thursday) for ten (10) hours each day.

74.     In March 2006, Mrs. Boone and Ms. Harris met over lunch to discuss tensions between Ms. McComas and Ms. Harris.  Mrs. Boone volunteered to meet with Ms. Harris to iron out issues relating to Ms. Harris and Ms. McComas.  Ms. Harris had complained about Ms. McComas's job performance. Ms. Harris told Mrs. Boone that she would like to assist Ms. Smith and Mrs. Boone in their job duties because she had not been given enough to do by Ms. McComas. As a result, Mrs. Boone and Ms. Harris shared their concerns about Ms. McComas – her improper use of the debit card and her failure to work full time.

75.     Mrs. Boone made these concerns known to the Board of Directors.

76.     In April 2006, upon Ms. McComas' s return to work, her unprofessional attitude towards Ms. Harris prompted Ms. Harris to send an e-mail to counsel for MountainMade, asking

about whistleblower protection.

77.    In April 2006, Jack Carpenter visited MountainMade to have discussions with Plaintiffs . Each was given a letter thanking them for bringing issues to the attention of the board and it recited their rights to protection under MountainMade's whistleblower policy.

78.    On April 5, 2006, Jack Carpenter, as Chairman of the Board of Directors of MountainMade, confirmed by letter dated April 5, 2006, that Ms. Harris made disclosures to the Board of Directors.

79.    In April 2006, Ms. McComas hired Sara Hunt and asked the new hire to share her office with her.

80.    In April 2006, Ms. Harris began organizing and inventorying the studio equipments after being told to do so by Mrs. Boone. This was because Jack Carpenter said it should be top priority to get all of the equipments labeled and an inventory system put in place.

81.    Ms. McComas hired Dusty from Vandalia to organize and do inventory at the studios without communicating this to Ms. Harris at all.

82.    In May 2006, Nancy Leonard met with Ms. Harris to hear her concerns on the "management issues" at MountainMade. During discussions, Nancy Leonard told Ms. Harris that it was probably best if Ms. Harris's office was moved to the Country Store for a while until things cooled down.

83.    In May 2006, Ms. Harris was no longer allowed in the gallery whenever Ms. McComas was there under instructions from Ms. McComas. Ms. Harris was told she could only work retail at the Country Store so as to enable her to continue her work on studio assignments.

84.    Ms. Harris's job was advertised in the local papers without her knowledge or

given any communication whatsoever to that effect.

85.   Ms. Harris was told she could not have the full-time hours during the summer because there wasn't a need for a full-time employee, although, a new employee was hired and shortly thereafter, became full-time.

86.   Ms. Harris was to return to college, but now MountainMade would not work around her schedule although there were other employees presently working whose schedules were being worked around. Mark asked for Ms. Harris's resignation which she did not give because she felt that it was not her decision to stop working at MountainMade.

Holly Smith

87.   On October 31, 2001, Ms. Smith was hired as a Customer Service Representative at $8.00/hr.  Ms. Harris began working full-time two weeks later.

88.   On November 30, 2001, Ms. Smith was promoted to the position of Customer  Service Manager at an annual salary of $25,000.

89.   On March 25, 2003, Ms. Smith received a raise to an annual salary of $30,000.

90.   On April 5, 2004, Ms. Smith received another employee review and maintained her annual salary of $30,000.

91.   On December 6, 2005, Ms. Smith received a one-year performance evaluation  from Ms. McComas and was promoted to Retail Director. Her annual salary increased from $30,000 to $35,000.

92.   On April 5, 2006, Jack Carpenter, as Chairman of the Board of Directors of MountainMade, confirmed by letter dated April 5, 2006, that Ms. Smith made disclosures to the

Board of Directors.

93.    In June 2006, Ms. Smith received a title change from Retail Director to Purchasing Manager. Her annual salary remained at $35,000.

94.    On January 5, 2007, Ms. Smith was `pretextually "relieved of her duties with MountainMade in efforts to help  maintain and sustain the organization."

Charles Barker

95.    Mr. Barker was hired on August 28, 2001, by Pamela Grandstaff, as Truck Driver and Warehouse Assistant with an annual salary of $25,000. On October 31, 2001, Mr. Barker received a contract with MountainMade. He was later promoted to Warehouse Manager some time that year with an annual salary of $30,000.

96.    On May 31, 2002, Pamela Grandstaff appointed Mr. Barker to Facilities Manager for a one-year period from June 2, 2002, through June 1, 2003, at an annual salary of $35,000.

97.    On May 27, 2003, Pamela Grandstaff appointed Mr. Barker Operations Manager for a one-year period, from June 1, 2003, through May 31, 2004, at an annual salary of $36,750.

98.    On June 1, 2004, Mr. Barker received a one-year employee review and Ms. McComas re-appointed Mr. Barker to the Operations Manager position for a one-year period from June 1, 2004, through May 31, 2005, at an annual salary of $36,750. Ms. McComas rated his performance "outstanding; surpassing all expectations," and based on a score of 5, Charles received a 7.

99.    On December 15, 2005, Mr. Barker received another one-year employee

review and was promoted to Operations Director with an annual salary of $40,000.

100.    In June of 2006, Mr. Barker received a title change from Operations Director to IT Manager. At all times, Mr. Barker reported directly to Ms. McComas.

101.    On April 5, 2006, Jack Carpenter, as Chairman of the Board of Directors of MountainMade, confirmed by letter dated April 5, 2006, that Mr. Barker made disclosures to the Board of Directors.

102.    On August 11, 2006, MountainMade, through Mark Kessler, its new General Manager, fired Mr. Barker, its IT Manager.

### SBA Funds Earmarked to MountainMade Under Federal Appropriation Measures

103.    MountainMade has received federal grants of $6,370,000 through earmarked appropriation measures voted out of the House Appropriation Committee through Congressman Mollohan since 2002. The grants provided by the Small Business Administration, headquartered in Washington, DC, were distributed as follows:

|       |             |
| ----- | ----------- |
| 2002  | $1,100,000  |
| 2003  | $1,100,000  |
| 2004  | $1,200,000  |
| 2005  | $1,100,000  |
| 2006  | $1,870,000  |
| Total | $6,370,000  |

### Termination of Holly Smith

104.    On June 21, 2006, Defendants convened a staff meeting, and at that time, began a series of reprisals that resulted in terminations, demotions and adverse employment actions

causally related to Plaintiffs' whistle blowing activities.

105.    On June 21, 2006, the entire MountainMade met for about 45 minutes. There were approximately 12 on staff at the time. Ms. McComas held forth. She was triumphant. She used this meeting to publicly embarrass and humiliate the whistleblowers. She singled them out. She announced Plaintiffs' emotions and a new organization chart. It was a key turning point and signal for what was to come next.

106.    Ms. McComas announced at the staff meeting the demotions of Mrs. Boone, Mr. Barker, Ms. Smith, and Ms. Harris. Based on information and belief, these acts were authorized and approved by the Board of Directors and Defendants.

107.    Mrs. Boone was demoted effective immediately from VP of Finance to Finance Manager. She was no longer an officer of the corporation under the announcement. She was stripped of her authority and prestige as an officer of MountainMade.

108.    Mr. Barker demoted effectively immediately from Operations Director to IT Manager.

109.    Ms. Smith demoted effective immediately from Retail Director to Purchasing Manager.

110.    Ms. Harris was demoted effective immediately from Assistant to the Executive Director to Retail Clerk, the lowest ranking position at MountainMade.

111.    Mr. Barker was stripped of all supervisory duties.

112.    Ms. Smith was stripped of her supervisory duties.

113.    Ms. Smith was fired on January 5, 2007.

114.    Mrs. Boone was constructively discharged on January 12, 2007, as a direct and\

proximate result of intolerable working conditions.

115.    Mr. Barker was terminated on August 17, 2006.

116.    Marissa Harris was discharged on September 19, 2006, as a direct and proximate result of her whistle bowing activities. Before her disclosures Ms. McComas assured her that MountainMade would work around her schedule to accommodate her attending school but after the whistle blowing, she was told that there would be no accommodation and no job. In addition, she experienced intolerable working conditions and abuse, as did the other three Plaintiffs.

Reprisal Based on False and Fraudulent Acts Discovered and Disclosed

117.    Mrs. Boone discovered that Ms. McComas had misappropriated Government Funds by converting MountainMade funds to her personal use on repeated occasions. During the period, from April 2005 to March 2006, Ms. McComas misappropriated at least $12,000. In turn, the funds unlawfully taken were funds of the Government obtained by MountainMade using the grant process through the artifice of a false submission to the SBA. After the Board of Directors meeting, Ms. McComas repaid about $4,000.

118.    Mrs. Boone discovered that Ms. McComas had misappropriated Government Funds by converting MountainMade funds to her personal use on repeated occasions during the previous period of Ms. McComas's tenure – at least 18 months prior to April 2005. The amount of the misappropriation is not known but the method was the same. In turn, the funds unlawfully taken by Ms. McComas were funds of the Government obtained by MountainMade using the grant process through the artifice of a false submission to the SBA.

119.    The Government forms completed for Ms. McComas with information and data on the financial records, were reviewed by Ms. McComas and signed by Ms. McComas. The

forms were about 12 pages in length. The completed forms contained inaccuracies and

misrepresentations. In addition to the use of the MountainMade card, Ms. McComas

used the company car for personal purposes, used MountainMade funds for personal

entertainment, and used a MountainMade cell phone ($400 or more per month) for personal

purposes. Ms. McComas's utilities for her house were paid by MountainMade. Ms. McComas

gave inventory of MountainMade to her friends. Ms. McComas worked 20 hours a week,

however, the Government paid MountainMade for a full-time position. An audit was necessary.

120.    Persons who conspire to defraud the Government by getting a false or

fraudulent claim allowed or paid subjects are liable under the False Claims Act, 31 U.S.C. §

3729(a)(3). Based on information and belief, there were several decision-makers who

participated in the unlawful acts alleged here. Based on information and belief, Congressman

Mollohan controls MountainMade and its Board of Directors – he call the shots. A member of

his staff attends the board meetings. The claims alleged herein, based on information and belief,

were approved and carried out by control persons at least at the board member level.

121.    The president of MountainMade misappropriated funds that were Government

funds over a period of years, through at least 2007. Since early March 2006 and continuing

thereafter, the MountainMade accountants Toothman Rice had knowledge of the

misappropriations and fraud on the Government reported to them by Mrs. Boone. Knowledge to

Toothman Rice is imputed to MountainMade. Based on information and belief, Toothman Rice

failed and otherwise refused to meet the standard of care in the circumstance.

122.    On or before March 23, 2006, the chairman of the board, Defendant Carpenter,

had knowledge that the president of MountainMade had engaged in improprieties. At least one

other member of the board, Dale McBride, and MountainMade's legal counsel, had notice of the McComas misconduct. In furtherance of a coverup and reprisal, following the March 23, 2006, board meeting, Mr. Carpenter, in his capacity as Chairman of the Board of Directors and over MountainMade stationary, which he sent to Mrs. Boone, he made the following statement: "On behalf of the Board of Directors of the MountainMade Foundation, I would like to thank you for brining to our attention your concerns about MountainMade." Mr. Carpenter downgraded the whistleblowers claims despite clear evidence of intentional misappropriation to simple "concerns." Mr. Carpenter proclaimed that MountainMade and its Board of Directors) "are pursing our review and investigation of these issues . . . ." (Emphasis added) That investigation never materialized.  Mr. Carpenter, however, added the following veiled threat: "[W]e expect you and all other MM employees to remain productive and loyal . . . ." (Emphasis added) Loyalty in the face of whistleblowing was a code word for what was to come next and at the very same time that this April 6, 2006, letter went out to Mrs. Boone (same letter went to the other three), damaging and incriminating articles appeared in *The Wall Street Journal* and *The New York Times*. While Mr. Carpenter promised that "no one is entitled to engage in any punitive acts against you for bringing these concerns to our attention." (Emphasis added) They elected to retaliate against Plaintiffs. Defendants were clearly on notice of Plaintiffs' protected activities and Defendants were clearly on notice that their protected activity relating to false or fraudulent claims could reasonably lead to their filing claims as relators under the False Claims Act. Based on information and belief, in early March 2006 investigative reporters of the *Wall Street Journal* and *New York Times* were actively pursuing contacts, leads and information about Congressman Mollohan's non-profit corporations receiving federal earmarked money.

123.    MountainMade was under press scrutiny that was likely known to the Board of Directors in early March 2006. On April 7, 2006, The Wall Street Journal reported under the story line "Helping Hands," that "federal prosecutors have opened an investigation of Mr. Mollohan's finances and whether they were properly disclosed " – noting that he had not been accused of wrongdoing.

124.    On April 8, 2006, the investigative journalist article "Special Projects by Congressman Draw Complaints" appeared in the *New York Times,* labeling Mr. Carpenter "an old friend of the Congressman." It also singled out Ms. McComas because she was a director of MountainMade and had contributed $1,000 to the Congressman's political action committee. These news journal reports on Congressman Mollohan resulted in his June 14, 2006, press release detailing his recent real estate transactions and federal law mandated financial disclosure reports to the Clerk of the House of Representatives. He had served 12 terms.

125.    On June 13, 2006, Congressman Mollohan filed a letter with the Clerk of the House of Representatives correcting and revising six (6) years of disclosure reports about his finances, covering 1999 through 2004. The Congressman remained under the microscope of investigative reporters. Another article appeared in the New York Times on November 26, 2006, relating to pork legislation, reciting that Congressman Mollohan had "resigned as the top Democrat on the ethics committee amid questions about his earmarks to non-profits he funded and his real estate partners.

126.    On April 7, 2006, the UPI published a news item that Congressman Mollohan "has fueled five non-profit groups in his West Virginia district with $250 million in earmark funding, The New York Times reports." The UPI  news release specifically identified

MountainMade and the other four non-profits and include West Virginia High Technology

Consortium Foundation; Institute for Scientific Research; and Vandalia Heritage Foundation. A

grand jury issued subpoenas have been issued since March 2006. Agents of the Federal Bureau of

investigation have interviewed since interviewed former functionaries of MountainMade.


## COUNT I

(Violation of the Whistleblower Provisions of the False Claims Act,
31 U.S.C. § 3730(h))

127.    Plaintiffs repeat and incorporate by reference each of the allegations set forth in

paragraphs 1 through 126 against all Defendants.

128.    The employment of Plaintiffs by MountainMade was terminated and they were

forced out and mistreated, abused and humiliated as a direct and proximate result of having

engaged in protected activity under the False Claims Act, in violation of the whistleblower

provisions under 31 U.S.C. § 3730(h).  Under that section, federal law makes it unlawful to

retaliate against any employee who investigates or reports a false statement to the United States

within the meaning of the act.  Any person violates 31 U.S.C. § 3729(a)(2) who "knowingly

makes, uses, or causes to be made or used, a false . . . statement to get a false or fraudulent claim

paid or approved by the government." And each claim for payment under a submission that is  a

false statements is a separate and distinct prohibited act. Plaintiffs investigated and reported false

claims in furtherance of a *qui tam* action because of actual and threatened fraud on the United

States. Defendants had direct knowledge that Plaintiffs had investigated, complained of,

discovered and reported false claims to the Government. Defendants knowingly engaged in and

otherwise approved retaliatory action and coverup starting at the Board of Directors level,

through MountainMade's officers, agents and functionaries to silence whistleblowing by Plaintiffs.

129.    Defendants Carpenter and McComas were directly involved in and approved and carried out themselves, and through their agents and representatives, unlawful acts over a period of months under a plan to silence Plaintiffs and punish them. The retaliation unfolded over a time period of reasonable proximity to the protected activity and intensified over a short period of months. Defendants MountainMade, Carpenter and McComas retaliated in violation of the False Claims Act under 31 U.S.C. § 3730(h).

130.    The false and fraudulent statements alleged here were made to the Government through the Unites States mail and by wire. The false statements were material, resulting in substantial payments by the Government that were unlawful.

131.    The acts complained of here were done wilfully, wantonly, and intentionally with evil motive, so as to justify imposition of punitive damages to the extent permitted by applicable law.

### COUNT II

(Wrongful Discharge in Violation of Public Policy)

132.    Plaintiffs repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 131 against all Defendants.

133.    Plaintiffs were wrongfully discharged in violation of public policy.

134.    Defendants wrongfully terminated Plaintiffs in violation of public policy, including the mandates of 18 U.S.C. § 1001, which prohibits submission of false information to the Government. See also 18 U.S.C. § 1513(e).

135.    Defendants retaliated and terminated Plaintiffs unlawfully because of, and as a direct and proximate outcome of their protected whistleblowing activities, including disclosures to the MountainMade accountants, Board of Directors and its officers.

136.    Under the federal statute 18 U.S.C. § 1001 there is no private right of action.

137.    As a direct and proximate consequence of the wrongful and retaliatory discharge of Plaintiffs, they have suffered and will continue to suffer damages including, but not limited to, lost wages, lost benefits, diminished professional status, diminished job opportunities, mental anguish and stress.

138.    The acts complained of here were done wilfully, wantonly, and intentionally with evil motive,  so as to justify imposition of punitive damages to the extent permitted by applicable law.

## COUNT III

### (Civil Conspiracy)

139.    Plaintiffs repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 138 against all Defendants.

140.    Plaintiffs allege that they were terminated, actually or constructively, as a direct and proximate result of their whistle blowing activities.

141.    Defendants agreed and conspired to make fraudulent representations.

142.    Defendants conspired and agreed with one another through overt acts in furtherance of unlawful acts, and Defendants directly and proximately caused Plaintiffs to suffer loss of income and other economic benefits and loss of employment opportunities, diminished professional status, diminished job opportunities and future employment, diminished status,

mental anguish and emotional distress.

143.   The acts complained of here were done wilfully, wantonly, and intentionally with evil motive,  so as to justify imposition of punitive damages to the extent permitted by applicable law.

## **Prayer for Relief**

WHEREFORE, Plaintiffs pray for the following relief:

1.      Enter judgment for Plaintiffs and against Defendants, jointly and severally, under the Employee Protection Provisions of the False Claims Act, 31 U.S.C. § 3730(h).

2.      Enter judgment for Plaintiffs and against Defendants, jointly and severally, under the damage claims herein.

3.      Enter judgment for Plaintiffs and against Defendants for conspiracy to commit unlawful acts or wrongful discharge, fraudulent misrepresentation and fraud, in perpetration of a common scheme, in an amount to be determined at trial.

4.      Enter judgment for Plaintiffs and against Defendants for wrongful discharge in violation of public policy making against unlawful acts or wrongful discharge, fraudulent misrepresentation and fraud, in perpetration of a common scheme, in an amount to be determined at trial.

5.      Award Plaintiffs compensatory damages in an amount to be proven at trial, but in any event not less than $1,000,000 each.

6.      Award Plaintiffs punitive damages in an amount to be proven at trial, but in any event not less than $3,000,000 each.

7.      Award Plaintiffs all reasonable attorneys fees, expenses and costs.

8.    Grant and otherwise award such further and additional relief as the Court may

deem just and proper.


Respectfully submitted,


Dated: June 20, 2008

C. Michael Tarone, D.C. Bar # 159228
Tarone & McLaughlin
1010 Vermont Ave., N.W.
Suite 810
Washington, DC 20005


Tel. (202) 347-9526
Fax  (202) 783-9103

Counsel for Plaintiffs

CRYSTAL BOONE
MELISSA HARRIS
CHARLES BARKER
HOLLY SMITH


## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable as a matter of law.


C. Michael Tarone

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Crystal Boone<br>Melissa Harris<br>Charles Barker<br>Holly Smith | MountainMade Foundation<br>Kate McComas<br>Jack Carpenter |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     Preston Cty, WV<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF<br>LAND INVOLVED |
|---|---|
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>C. Michael Tarone, Esq.<br>Tarone & McLaughlin LLP<br>1010 Vermont Ave., NW<br>Suite 810<br>Washington,DC 20005<br>(202) 347-9526 | ATTORNEYS (IF KNOWN)<br>N/A |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

| ○ **A.** *Antitrust* | ○ **B.** *Personal Injury/ Malpractice* | ○ **C.** *Administrative Agency Review* | ○ **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>Social Security:<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>Other Statutes<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ **E.** *General Civil (Other)*     **OR**     ○ **F.** *Pro Se General Civil* | | | |
|---|---|---|---|
| **Real Property**<br>210 Land Condemnation<br>220 Foreclosure<br>230 Rent, Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property<br><br>**Personal Property**<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property Damage<br>385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC  7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

ORIGINAL

| O  G. *Habeas Corpus/ 2255* | O  H. *Employment Discrimination* | O  I. *FOIA/PRIVACY ACT* | O  J. *Student Loan* |
|---|---|---|---|
| 530 Habeas Corpus-General 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O  K. *Labor/ERISA (non-employment)* | O  L. *Other Civil Rights (non-employment)* | O  M. *Contract* | O N. *Three-Judge Court* |
|---|---|---|---|
| 710 Fair Labor Standards Act 720 Labor/Mgmt. Relations 730 Labor/Mgmt. Reporting & Disclosure Act 740 Labor Railway Act 790 Other Labor Litigation 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities- Employment ☐ 446 Americans w/Disabilities- Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding   O 2 Removed from State Court   O 3 Remanded from Appellate Court   O 4 Reinstated or Reopened   O 5 Transferred from another district (specify)   O 6 Multi district Litigation   O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

31 U.S.C. § 3730(h) - retaliatory and wrongful discharge under the anti-retaliation provision of the False Claim Act

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   DEMAND $ $1,000,000.00   Check YES only if demanded in complaint
JURY DEMAND:   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  June 19, 2008   SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.