# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CRYSTAL BOONE, *et al.*,

      Plaintiffs,

      v.

MOUNTAINMADE FOUNDATION,

      Defendant.

Civil Action No. 08-1065 (CKK)

## MEMORANDUM OPINION
(August 20, 2014)

Plaintiffs Crystal Boone,[1] Melissa Harris, Charles Barker, and Holly Smith bring this action against their former employer, MountainMade Foundation ("MM"), under the Civil False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and state law. Plaintiffs assert two claims against Defendant: (1) MM violated the "whistleblower" provisions of the FCA; and (2) MM violated public policy under West Virginia state law by wrongfully discharging Plaintiffs. Currently before the Court is Defendant's [70] Motion for Summary Judgment and Plaintiffs' [95] Motion to File Surreply to Defendant's Reply Brief. Upon consideration of the pleadings,[2] the relevant

---

[1] Plaintiff was known as Crystal Roth at the time of her employment at MM, however, she has since changed her name. Plaintiff is referred to as Crystal Boone throughout the filings in this case and this Memorandum Opinion.

[2] While the Court bases its decision on the record as a whole, its consideration has focused on the following documents: Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. [70]; Def.'s Stmt. of Material Facts Not In Genuine Dispute ("Def.'s Stmt."), ECF No. [70]; Pls.' Mem. in Opp'n to Def's Mot. for Summ. J. ("Pls.' Opp'n"), ECF No. [74]; Pls.' Controverted Stmt. of Material Facts ("Pls.' Controv. Stmt."), ECF No. [74-1]; Pls.' Stmt. of Material Facts ("Pls.' Stmt."), ECF No. [74-1]; Pls.' 1st Errata to Opp'n, ECF No. [91]; Def.'s Reply to Pls.' Opp'n to Def.'s Mot. for Summ. J., ECF No. [93] ("Def.'s Reply"); Pls.' Mot. to File a Surreply ("Pls.' Mot. to File Surreply"), ECF. No. [95]; Pls.' Surreply Memo. ("Pls.; Surreply"), ECF No. [95-3]; Def.'s Opp'n to Pls.' Mot. to File a Surreply, ECF No. [97]; Pls.' Reply to Opp'n to Mot. to File Surreply, ECF No. [98]; Pls.' 2d Errata to Opp'n, ECF No. [99]. The motion is fully

legal authorities, and the record as a whole, the Court GRANTS IN PART and DENIES IN PART Defendant's [70] Motion for Summary Judgment, and GRANTS Plaintiffs' [95] Motion to File Surreply for the reasons stated herein.

The Court denies summary judgment as to Plaintiff Boone's alleged demotion under the FCA, but grants summary judgment as to Plaintiff Boone's alleged constructive discharge under both the FCA and state law. The Court denies summary judgment as to Plaintiff Barker's alleged demotion under the FCA, but grants summary judgment as to Plaintiff Barker's termination from employment under the FCA and state law. Similarly, the Court denies summary judgment as to Plaintiff Smith's alleged demotion under the FCA, but grants summary judgment as to Plaintiff Smith's termination from employment under the FCA and state law. Finally, the Court denies summary judgment as to Plaintiff Harris's alleged constructive discharge under both the FCA and state law, but grants summary judgment as to Plaintiff Harris's alleged demotion under the FCA.

Accordingly, the Plaintiffs' claims related to the alleged demotions of Plaintiffs Boone, Barker, and Smith under the FCA as well as the alleged constructive discharge of Plaintiff Harris under both the FCA and state law survive Defendant's Motion for Summary Judgment.

## I. BACKGROUND

### A. Scope of this Action

Defendant MM is a nonprofit organization that received the majority of its funding from inception through 2006 from federal government grants from the Small Business Administration

---

briefed and ripe for adjudication. In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering its decision. *See* LCvR 7(f).

("SBA").[3] Def.'s Stmt. ¶ 3.[4]  In March 2006, Plaintiffs, four MM employees, raised concerns to the MM Board of Directors about MM Executive Director Kate McComas.  Id. ¶¶ 13-20. Among other things, Plaintiffs asserted that Ms. McComas was using the MM debit card for personal expenditures.  Id. ¶¶ 16-17.  As a result, Ms. McComas was asked to reimburse MM for some purchases made on the debit card.  Def.'s Stmt. ¶ 23; Pl.'s Controv. Stmt. ¶ 21.

Plaintiffs commenced this action on June 20, 2008, claiming that after making the disclosures to the board, subsequent actions taken by MM, including Plaintiffs' alleged demotions and discharges, were made in retaliation for their whistleblowing activities in violation of  31 U.S.C. § 3730(h).  See Compl., ECF No. [1]; 2d Amend. Compl., ECF No. [33]. Plaintiffs further assert that they were wrongfully discharged in violation of public policy under West Virginia state law.  Defendant argues that Plaintiffs have failed to establish that their reports to the board put them within the purview of 31 U.S.C. § 3730(h) or, in the alternative, that they were subject to adverse job actions in retaliation for their reports to the board.

---

[3] Plaintiffs claim to dispute this fact in their Controverted Statement of Material Facts. See Pls.' Controv. Stmt. ¶ 3.  However, Plaintiffs' position is that MM received 86% of its funding from grants through the SBA.  Id.  This position is not contrary to Defendant's assertion that MM received a majority of its funding through these grants.

[4] The Court strictly adheres to the text of Local Civil Rule 7(h) when resolving motions summary judgment, a matter previously brought to the parties' attention. See Order Establishing Procedures for Cases Assigned to Judge Colleen Kollar-Kotelly at 6, ECF No. [49]; Order at 2, ECF No. [68].  Accordingly, the Court shall refer to Defendant's Statement of Material Facts Not In Genuine Dispute ("Def.'s Stmt."), ECF No. [70], unless a statement is contradicted by the opposing party, in which case the Court may cite to Plaintiffs' Controverted Statement of Material Facts ("Pls.' Controv. Stmt."), ECF No. [74-1], or Plaintiffs' Statement of Material Facts ("Pls.' Stmt."), ECF No. [74-1]. To the extent that the Court cites to Plaintiffs' Statement of Material Facts, the Court shall also provide the full citation to the supporting exhibits because of the difficulty in locating Plaintiffs' exhibits.  The Court notes that Plaintiffs' exhibits appear in ECF with differing exhibit numbers. For consistency, Plaintiffs' exhibits will be cited throughout this Memorandum Opinion using the exhibit numbers as listed in Plaintiffs' "Corrected Index and Exhibits" found in Plaintiffs' second Errata to Opposition, ECF No. [99].

Defendant also argues that Plaintiffs failed to make out a claim for wrongful discharge in violation of public policy.

## B. Procedural History

On June 20, 2008, Plaintiffs filed suit against Defendant in this Court.[5] Defendant filed its Motion to Dismiss, or in the Alternative, a Motion for Summary Judgment on August 22, 2008, contending that Plaintiffs failed to state a claim for which relief could be granted. Judge Ricardo M. Urbina agreed and granted Defendant's Motion by an Order entered on February 15, 2010. *See Boone v. Mountainmade Found., Inc.* (*Boone I*), 684 F. Supp. 2d 1 (D.D.C. 2010). On March 12, 2010, Plaintiffs filed a Motion to Alter or Amend Judgment or In the Alternative, For Leave of Court to File Second Amended Complaint. Judge Urbina granted Plaintiffs' request to amend the complaint by Memorandum Order entered on April 7, 2011, and Plaintiffs' Second Amended Complaint was filed that same day. On May 5, 2011, Defendant filed a Motion to Dismiss Count II of Plaintiffs' Second Amended Complaint, arguing that Plaintiffs failed to state a claim for wrongful discharge in violation of public policy. This Court denied Defendant's Motion by an Order entered on April 30, 2012.[6] *See Boone v. Mountainmade Found., Inc.* (*Boone II*), 857 F. Supp. 111 (D.D.C. 2012).

Defendant subsequently filed the instant Motion for Summary Judgment. *See* Def.'s Mot., ECF No. [70]. Defendant argues that Plaintiffs failed to establish claims for retaliation in violation of the FCA because Plaintiffs have not provided sufficient evidence to demonstrate that they were engaged in protected activity. Defendants also argue that Plaintiffs were not demoted

---

[5] Kate McComas and Jack Carpenter were named as Defendants in the original Complaint, however, they were no longer joined as Defendants in the First Amended Complaint, filed on March 3, 2009. *Compare* Compl. at 1, ECF No. [1] *with* 1st Amend. Compl. at 1, ECF No. [14].

[6] This matter was reassigned from Judge Urbina to this Court on April 20, 2012.

or constructively terminated and, accordingly, were not subject to adverse employment actions. In the two instances in which Plaintiffs were terminated from employment, Defendant argues that Plaintiffs have not demonstrated that these acts were done in retaliation for the reports to the board. Finally, Defendant contends that Plaintiffs cannot demonstrate that they were subject to wrongful discharge in violation of public policy as a matter of law because this claim was premised on the alleged violation of the retaliation provision of the FCA.

Plaintiffs filed an Opposition to Defendant's Motion. *See* Pls.' Opp'n, ECF No. [74]. The Court notes that Plaintiffs attached reams of exhibits to their opposition, totaling well over 2,000 pages and including entire deposition transcripts. *See* ECF. Nos. [74], [76]—[79], [81]—[85], [86]—[87]. Many of the exhibits were mismarked and often the Court was required to search through the entire set of exhibits to locate the referenced document. In Plaintiffs' Controverted Statement of Material Facts and Plaintiffs' Statement of Material Facts, Plaintiffs respond to 34 of the 36 facts cited in Defendant's Statement of Facts and then present additional facts numbered 1 through 442, many of which are largely irrelevant and not cited to the proper authority within the voluminous exhibits.[7] *See generally* Pls.' Controv. Stmt., at ECF No. [74-1]; Pls.' Stmt., ECF No. [74-1]. Despite filing two errata, Plaintiffs failed to correct the mistakes in the original filings. *See* Pls.' 1st Errata to Opp'n, ECF No. [91]; Pls. 2d Errata to Opp'n, ECF No. [99]. In addition, Plaintiffs at time identify facts in their pleadings that are not presented in either their Controverted Statement of Material Facts or their statement citing 442 additional material facts. Further, Plaintiffs have failed to provide several exhibits cited as support to their material facts, thus, providing no evidentiary basis for their assertions.

---

[7] Plaintiffs' additional facts were numbered 1 through 442, however, several were left blank and were not numbered sequentially so the Court is uncertain as to the precise number of facts actually presented.

Pursuant to Local Rule 7(h), a party filing a motion for summary judgment must include a statement of material facts as to which that party contends there is no genuine issue. An opposition to a motion for summary judgment must include "a separate *concise* statement of genuine issues setting forth *all material facts* as to which it is contended there exists a genuine issue necessary to be litigated, which shall include *references to the parts of the record relied on to support the statement*." LCvR 7(h) (emphasis added). The D.C. Circuit has explained:

> [A] district court judge should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make his own analysis and determination of what may, or may not, be a genuine issue of material disputed fact. In this respect, a district court may legitimately look to and rely upon counsel to identify the pertinent parts of the record, to isolate the facts that are deemed to be material, and to distinguish those facts which are disputed from those that are undisputed.

*Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988). Indeed, "our district courts' Local Civil Rule 7(h) expressly authorizes courts to treat as forfeited evidence—including record evidence—that the parties fail to highlight at summary judgment . . . . The existence of a genuine dispute of material fact, therefore, ordinarily turns not on a review of the entire record, but rather on the 'facts' and the portions of the record each party specifically highlights." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 136-37 (D.C. Cir. 2011). In an exercise of its discretion, the Court shall only consider material facts that are set out in the Defendant's Statement of Material Facts Not In Genuine Dispute, Plaintiffs' Controverted Statement of Material Facts, or Plaintiffs' Statement of Material Facts, and that are cited to and supported by exhibits filed with the Court. Fed. R. Civ. P. 56(c) & (e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . , the court may consider the fact undisputed for the purposes of the motion."). The Court shall not rely on material facts raised only in the parties' pleadings, and not in their statements of material facts. *Jackson v. Finnegan,*

*Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150-51 (D.C. Cir. 1996) (noting that the Court may require strict compliance with the predecessor rule to LCvR 7(h), which "places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record").

Defendant, through a footnote in its reply, requests that the Court enter a protective order to relieve Defendant from responding to Plaintiffs' additional facts. Def.'s Reply at 2 n.1. The Court notes that the proper procedure for obtaining a protective order is through the filing of a separate motion, not through placing the request in a footnote within the reply. However, Defendant's reply rests on legal rather than factual arguments in support of its motion. *See generally* Def.'s Reply (arguing that Plaintiffs did not provide evidence to establish that they were engaged in "protected activity" or subject to "adverse employment actions" within the meaning of the statute and case law). Accordingly, the Court shall not require Defendant to respond to Plaintiffs' Statement of Material Facts.

Given that the filings are a far cry from a model of clarity, the Court shall address the issues raised by the parties in their statements of material facts that are properly cited to the record and supported by the cited material. To the extent that this affects the outcome of the pending motion, the fault and accountability must rest with the parties. In instances where the Court has been unable to locate a document or evidence is cited incorrectly, this information shall be noted in a footnote.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that he] . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar

summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of his position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in his favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to [the trier of

fact] or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*,

477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is

some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not

sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50

(citations omitted).

## III. DISCUSSION

The FCA imposes civil penalties against a person who "knowingly presents, or causes to

be presented, to an officer or employee of the United States Government . . . a false or fraudulent

claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a

false record or statement to get a false or fraudulent claim paid or approved by the Government."

*See* 31 U.S.C. § 3729(a)(1)-(2) (repealed 2009). Section 3730(h) of the FCA was enacted to

provide legal protection from retaliatory acts for those who may be considering exposing fraud.

*United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998) (quoting S.

REP. NO. 99-345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300). Section 3730(h), at the

relevant time period, provided:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in
> any other manner discriminated against in the terms and conditions of
> employment by his or her employer because of lawful acts done by the employee
> on behalf of the employee or others in furtherance of an action under this section,
> including investigation for, initiation of, testimony for, or assistance in an action
> filed or to be filed under this section, shall be entitled to all relief necessary to
> make the employee whole . . . .

31 U.S.C. § 3730(h) (repealed 2009).

There are two basic elements to a claim under this section: (1) "acts by the employee 'in

furtherance of' a suit under § 3730 — acts also known as 'protected activity'"; and (2)

"retaliation by the employer against the employee 'because of' those acts.'" *United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1237 (D.C. Cir. 2012). The second element of the claim, known more commonly as the causation question, is further divided into two inquiries: "(1) did 'the employer ha[ve] knowledge the employee was engaged in protected activity'; and (2) was the employer's adverse action against the employee 'motivated, at least in part, by the employee's engaging in [that] protected activity.'"[8] *Id.* at 1237-38 (quoting *United States ex rel. Yesudian*, 153 F.3d at 736).

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims at the summary judgment stage. *Schweizer*, 677 F.3d at 1241. As the D.C. Circuit explained:

> Under *McDonnell Douglas*, an employee first must make out a prima facie case of retaliation by showing '(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two.' If the employee does so, then the burden shifts to the employer to 'produce admissible evidence that, if believed, would establish that [its] action was motivated by a legitimate, nondiscriminatory reason.' Once that occurs, 'the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence.'

*Id.* at 1240-41 (internal citations omitted).

A. **Protected Activity**

The Court first turns to the issue of whether Plaintiffs engaged in a protected activity by making reports to the MM board regarding Ms. McComas's actions. In order to come within the protection of section 3730(h), "'it is sufficient that a plaintiff be investigating matters that 'reasonably could lead' to a viable False Claims Act case.'" *United States v. Am. Nat'l Red Cross (Hoyte ex rel. United States)*, 518 F.3d 61, 66 (D.C. Cir. 2008) (quoting *Yesudian*, 153 F.3d at 740). Plaintiffs' mere dissatisfaction with their treatment on the job is not enough to demonstrate

---

[8] The Court shall discuss Defendant's contention that Plaintiffs must establish causation under the "but-for" standard *infra*.

that they were engaged in protected activity. *Yesudian*, 153 F.3d at 740. "Nor is an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations." *Id.* Instead, "[t]o be covered by the False Claims Act, the plaintiff's investigation must concern 'false or fraudulent' claims." *Id.* "Determining whether an employee has engaged in protected conduct under the FCA is a 'fact specific inquiry.'" *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005) (quoting *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 187 (3d Cir. 2001)).

Plaintiffs are not, however, required to actually know that the investigation they are pursuing could result in a FCA suit and, accordingly, Plaintiffs are not required to alert Defendant of the prospect of a FCA suit. *United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1237 (D.C. Cir. 2012). Rather, the requirement is only that acts be done in furtherance of a FCA action and "even an investigation conducted without contemplation of—or knowledge of the legal possibility—a False Claims Act suit can end up being 'in furtherance' of such an action." *Yesudian*, 153 F.3d at 741. As the D.C. Circuit reasoned, to require Plaintiffs to have specific knowledge that their investigation would give rise to a FCA suit would limit protection from retaliation only to lawyers or those versed in the law. *Id.*

Plaintiffs present the following account of the events leading up to their disclosures regarding Ms. McComas, MM's Executive Director, to the MM board. Plaintiffs, after realizing they each had information about Ms. McComas, met several times in February and March 2006 to discuss their individual experiences. Pls.' Stmt. ¶¶ 87- 88 (citing Pls.' Ex. 208 at 69, 83, ECF No. [79-3] (Smith Dep., Vol. I)). In particular, Plaintiffs believed that Ms. McComas was using

MM's debit card for personal expenditures,[9] that she did not work her required hours, that she misrepresented her hours worked on her timesheet, and that she used the MM vehicle for personal use and did not properly log mileage. Plaintiffs also addressed other issues regarding Ms. McComas's lack of leadership and management skills. *See* Pls.' Stmt. ¶¶ 110-125 (citing Pls.' Ex. 5, ECF No. [74-2] (Letter from Barker to MM board); Pls.' Ex. 23, ECF No. [74-11] (Letter from Harris to MM board); Pls.' Ex. 24, ECF No. [74-12] (Letter from Smith to MM board); Pls.' Ex. 53, ECF No. [87-8] (Letter from Boone to MM board)).

In early March 2006, Plaintiff Boone disclosed the group's concerns about Ms. McComas to Bill Phillips, MM's CPA at Toothman & Rice, who in turn consulted with another partner at his firm. Pls.' Stmt. ¶¶ 90-91 (citing Pls.' Ex. 200 at 97, 104, ECF No. [78-1] (Boone Dep., Vol. I)). Mr. Phillips informed Ms. Boone that if she did not take the concerns regarding Ms. McComas to the MM Board of Directors, that she could be held criminally liable. *Id.* Plaintiffs then decided that Ms. Boone would raise their concerns to Dale McBride, an MM board member. Pls.' Stmt. ¶ 92 (citing Pls.' Ex. 200 at 101-02, ECF No. [87-1] (Boone Dep., Vol. I)). After speaking with Ms. Boone, Mr. McBride notified Jack Carpenter, chairman of the MM board, and Peter Wolk, MM's legal counsel, of the allegations and they in turn spoke with Ms. Boone. Pls.' Stmt. ¶¶ 93-94 (citing Pls.' Ex. 167 ¶¶ 7-9, ECF No. [87-7] (Boone Declaration); Pls.' Ex. 200 at 104, ECF No. [87-1] (Boone Dep., Vol. I)). Ms. Boone was told that the issue would be addressed at the next MM board meeting. Mr. Carpenter told Ms. Boone that other employees with concerns about Ms. McComas could submit letters to the MM board. Def.'s Stmt. ¶ 14; Pls.' Controv. Stmt. ¶ 14. All four Plaintiffs submitted letters to the MM board, each dated

---

[9] It is undisputed that MM maintained a debit card through which funds could be withdrawn from MM's checking account with Huntington Bank. Def.'s Stmt. ¶¶ 8-9; Pls.' Controv. Stmt. ¶¶ 8-9. Funds from credit card purchases at MM retail stores were deposited into the Huntington Bank account. Def.'s Stmt. ¶ 8; Pls.' Controv. Stmt. ¶ 8.

March 17, 2006, and Ms. Boone also submitted a spreadsheet to the MM board detailing debit card charges, totaling $14,353.80, that she believed to be personal charges incurred by Ms. McComas. Def.'s Stmt. ¶¶ 15, 20; Pls.' Controv. Stmt. ¶¶ 15, 19 (citing Pls.' Ex. 5, ECF No. [74-2] (Letter from Barker to MM board); Pls.' Ex. 23, ECF No. [74-11] (Letter from Harris to MM board); Pls.' Ex. 24, ECF No. [74-12] (Letter from Smith to MM board); Pls.' Ex. 53, ECF No. [87-8] (Letter from Boone to MM board); Pls.' Ex. 25, ECF No. [74-13] (Spreadsheet created by Boone)). Ms. Boone's letter to the board asserted that, as the bookkeeper for MM, Ms. Boone was "covering improper use of SBA monies." Def.'s Stmt. ¶ 16; Pls.' Controv. Stmt. ¶ 16 (citing Pls.' Ex. 53, ECF No. [87-8] (Letter from Boone to board)).

The board meeting took place on March 23, 2006, with Ms. Boone present. Pls.' Stmt. ¶ 126 (citing Pls.' Ex. 97, ECF No. [76-7] (Minutes from March 23, 2006 Board Meeting). During the board meeting, Mr. Carpenter discussed the need for Ms. McComas to turn in expense records.[10] *See* Pls. Ex. 97 at 2-3, ECF No. [76-7] (Minutes from March 23, 2006 Board Meeting); Pls.' Ex. 200 at 148, ECF No. [78-1] (Boone Dep., Vol. I). Ms. McComas resigned as MM's Executive Director following the board meeting on March 23, 2006, but withdrew her resignation two days later via e-mail to Mr. Carpenter and Laura Kuhns, another MM board member. Pls.' Stmt. ¶¶ 128-29 (citing Pls.' Ex. 173, ECF No. [82-5] (E-mails from McComas to Carpenter)). In April 2006, Ms. McComas met with Mr. Carpenter and Ms. Kuhns to review the charges listed on the spreadsheet that was provided by Ms. Boone. Def.'s Stmt. ¶ 23; Pls.' Controv. Stmt. ¶ 21. The parties dispute the amount that Ms. McComas was required to

_____

[10] While this fact was not specifically pointed out by Plaintiffs in their Statement of Material Facts, the discussion is referenced in Exhibits submitted by Plaintiffs as cited. The actual discussion that took place at the board meeting is not relevant to the Court's analysis of whether Plaintiffs were engaged in protected activity, but is included in this discussion to clarify events that occurred subsequent to the board meeting, including Ms. McComas's brief resignation.

reimburse to MM as a result of these meetings. Plaintiffs allege that Ms. McComas reimbursed MM $6,100.76 for personal charges made on the MM debit card and Defendant asserts that the amount was $4,618.98. *Id.*

The parties disagree as to what proof Plaintiffs must present in order to demonstrate that they were investigating matters that "could reasonably lead" to a viable FCA suit and, consequently, that they were engaged in protected activity. The parties essentially talk past one another in their briefs, with Defendant relying on case law that establishes the standard at the relevant time to bring a successful *qui tam* action under the FCA and Plaintiffs relying on case law regarding the retaliation provision of the FCA.

Defendant argues that Plaintiffs must present either proof of a false claim directly submitted to the U.S. government or proof "that false representations were knowingly made to the government and that the false representations were made with the intention of receiving payment from the government." Def.'s Mot. at 12. Defendant argues that Plaintiffs failed to offer evidence that they raised concerns about false or fraudulent submissions by MM to the federal government because purchases made on the MM debit card were not submitted to the government for reimbursement and the funds in the debit card account at Huntington Bank were proceeds from credit card purchases at the MM retail stores. *Id.* at 12-13. Therefore, Defendant argues that Plaintiffs' actions do not fall within the purview of section 3730(h) protection because Plaintiffs only raised concerns about the misuse of funds already disbursed to MM, not about false claims submitted directly to the federal government. *Id.* at 13. Further, Defendant argues that Plaintiffs have presented no evidence that would justify an inference that MM made false statements to the government with the specific intent of getting the false claim approved by the government. *Id.* at 14. Plaintiffs disagree, arguing that their actions reasonably may have led

to a FCA suit given that the majority of MM's budget came from SBA grants.[11]  Pls.' Opp'n at 34-36.  The Court concludes that Plaintiffs engaged in protected activity within in the meaning of section 3730(h) for the reasons described herein.  *Id.*

Defendant cites to a prior opinion in the instant matter in support of its argument that Plaintiffs must establish Ms. McComas did more than misuse federal funds already distributed to MM.  Def.'s Mot. at 12 (citing *Boone v. Mountainmade Found.*, 684 F. Supp. 2d 1, 9 (D.D.C. 2010)).  Defendant states that, "[a]t best, the evidence will show that [Plaintiffs] raised general concerns regarding possible misuse of funds . . . ."  *Id.*  Defendant also relies on *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008), to support its argument that Plaintiffs failed to establish that they could raise a viable *qui tam* claim against MM.  Def.'s Mot. at 12; *see also  Allison Engine*, 553 U.S. 662, *superseded by statute*, Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(a), 123 Stat. 1617, *as recognized in United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 34-35 (D.D.C. 2010*)*.  In *Allison Engine*, the Supreme Court noted that a *qui tam* action brought under section 3729(a)(1) requires proof that a false claim was submitted directly to the government.  *Id.* at 667-68.  The Supreme Court

---

[11] Plaintiffs allege that MM sought reimbursement from the federal government for the cost of its inventory.  Pls.' Opp'n at 7.  Plaintiffs submitted as an exhibit a Notice of Award issued by the U.S. Small Business Administration that they purport demonstrates this fact.  Pls.' Stmt. ¶ 23 (citing Pls.' Ex. 55, ECF No. [76-3] (Notice of Award, U.S. Small Business Administration)).  Specifically, Plaintiffs note that the Notice reads, "[t]o receive payment or reimbursement, the Receipt must complete Standard Form 270 ('Request for Advance or Reimbursement')" as well as a 'Detailed Actual Expenditure for Period Covered by Request.  Pls.' Stmt. ¶ 68 (citing Pls.' Ex. 55 at 10, ECF No. [76-3] (Notice of Award, U.S. Small Business Administration)).  Plaintiffs further allege that a Taylor Books purchase in the amount of $1,107.70 was submitted to the SBA for reimbursement and that that total included $60 for mugs that Ms. McComas gave as a gift to Ms. Smith.  Pls.' Surreply at 3 (citing Ex. 164, at 2, ECF No. [95-4] (Smith's Amend. Answers to 1st Set of Interrogatories)).  However, Plaintiffs do not allege that this information was presented to the board as part of its report and, accordingly, is not relevant for the purposes of this analysis. *See* Pls.' Ex. 24, ECF No. [74-12] (Letter from Smith to MM board) (making no reference to the mugs allegedly given to Ms. Smith by Ms. McComas as a gift).

also held that actions brought under section 3729(a)(2), unlike those brought under section 3729(a)(1), do not require proof of an actual false claim submitted directly to the government, but rather require proof that the defendant made a false record or statement for the purpose of getting a false or fraudulent claim paid or approved by the government. *Id.* at 671. Applying this approach, it was insufficient under section 3729(a)(2) for a subcontractor to make a false statement to a private entity without the specific intent that the private entity would submit the false claim to the government and that the government would rely on that statement as a condition of payment.[12] *Id.* Accordingly, the Supreme Court's ruling in *Allison Engine* clarified that a plaintiff was required to provide proof that a false claim was submitted directly to the government under section 3729(a)(1) or proof that defendant made a false record for the purpose of getting a false or fraudulent claim approved by the government under 3729(a)(2), even if this false statement was made to a private entity.[13] Defendant argues that Plaintiffs have failed to provide the requisite proof to establish that they could have raised a viable *qui tam* claim based

---

[12] Prior to the Supreme Court's ruling in *Allison Engine*, this jurisdiction adopted the specific intent approach under section 3729(a)(2) approved by the Supreme Court. *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488 (D.C. Cir. 2004).

[13] The False Claims Act was amended in 2009 to eliminate the specific intent requirement for actions brought under section 3729(a)(2). This amendment applied retroactively to "claims" for reimbursement pending on or after June 7, 2008. Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(a), 123 Stat. at 1624-25; s*ee also, e.g., United States ex rel. Banignan v. Organon USA Inc.*, 883 F. Supp. 2d 277, 298 n.30 (D. Mass. 2012). Judge Urbina in this matter previously held that the 2009 amendment does not apply retroactively to the instant action because "claims" refers to defendant's request for payment, rather than civil actions pending on or after June 7, 2008. *See* Memorandum Opinion at 9 n.7, ECF No. [25]. The Court shall not reach a conclusion on this matter as the Court does not rely on section 3729(a)(2) in reaching its finding. *See United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) (not reaching the issue of whether the trial court erred in failing to apply the 2009 amendment retroactively because it did not have a bearing on the outcome of the case); *United States ex rel. Purcell v. MWI Corp.*, No. 98-2088 (GK), 2014 WL 2881550, at *3 n.4 (D.D.C. June 25, 2014) (adopting the holding in other jurisdictions that the retroactivity provision only applies to claims, meaning a defendant's fraudulent requests for money, pending on or after June 7, 2008, rather than civil cases pending on or after that date).

on *Allison Engine* and, as a result, have not demonstrated that they were engaged in protected activity.

Plaintiffs, on the other hand, rely on the D.C. Circuit's opinion in *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731 (D.C. Cir. 1998), to support their argument that they were engaged in protected activity by virtue of the fact that a majority of MM's budget came from SBA grants. Pls.' Opp'n at 26. The plaintiff in *Yesudian* was an employee of the Purchasing Department at Howard University when he filed suit against the University and three of his supervisors, alleging that defendants submitted false claims in violation of the FCA and that defendants retaliated against him for reporting the false claims allegations. *Yesudian*, 153 F.3d at 734. The D.C. Circuit found that plaintiff engaged in protected activity because he had knowledge that Howard received 80% of its money from the federal government and, accordingly, it would have been reasonable for plaintiff to conclude that there was a "distinct possibility" that he would find evidence of resubmission of claims by Howard directly to the federal government. *Id.* at 740. Further, the Court noted that the 80% figure alone gave plaintiff a "good faith basis" for going forward with a claim against Howard even if he did not have proof of resubmission of a false claim to the government. *Id.*

Following the reasoning set forth in *Yesudian*, Plaintiffs argue that that they have established that they were engaged in protected activity because they had reason to believe that the alleged misuse of the MM debit card would have resulted in fraud upon the U.S. government.[14] Pls.' Opp'n at 34. It is undisputed that MM received the majority of its funding

---

[14] To the extent that Defendant asserts that Plaintiff's reliance on *Yesudian* is misplaced because it was decided prior to the holding that section 3729(a)(2) embodies a specific intent requirement, the Court notes that Defendant relies on the discussion in *Yesudian* for bringing a *qui tam* action, not a retaliation action. Def.'s Reply at 4-5. As the Court previously noted, the bringing of a viable *qui tam* action is not an element of a retaliation claim.

from SBA grants. Further, Plaintiff Boone, who was the Vice President of Finance at the time of Plaintiffs' report to the board, estimated that 86% of MM's funding was received through grants from the federal government. *Id.* at 34. Plaintiffs point to their knowledge of MM's finances and Ms. Boone's estimate of MM's funding from the federal government in support of their argument that they succeeded in establishing that they were engaged in protected activity when they reported Ms. McComas's activities to the MM board. *Id.* at 34.

While the Court does not dispute that during the relevant time period Plaintiffs would have needed to produce evidence of a false claim submitted directly to the U.S. government or possibly of Defendant's specific intent to get a false or fraudulent claim approved by the government in order to succeed in an actual *qui tam* action, such a standard is not required for a FCA whistleblower retaliation claim. Defendant's argument conflates Plaintiffs' burden if they were to bring a *qui tam* action pursuant to section 3729(a) with Plaintiffs' burden in the instant action, alleging retaliation pursuant to section 3730(h). Case law in this jurisdiction requires that plaintiffs need only demonstrate that their investigation could reasonably lead to a FCA suit to be afforded whistleblower protection, not that plaintiffs' investigation uncovered and alleged all the essential elements of a *qui tam* action. *See Hoyte ex rel. United States*, 518 F.3d 61, 66 (D.C. Cir. 2008); *Yesudian*, 153 F.3d at 742 (The D.C. Circuit, quoting Judge Easterbrook, noted that "'§ 3730(h) protects 'investigation' as well as reports of fraud, and an 'investigation' precedes communication.").

Plaintiffs do not raise a *qui tam* action against MM in their complaint, nor is there a requirement that Plaintiffs pursue a *qui tam* action against Defendant or that the Attorney General bring an action against Defendant pursuant to section 3729 in order for Plaintiffs to receive protection against retaliation. *See* 2d Amend. Compl.; *Yesudian*, 153 F.3d at 740.

Indeed, "[a]n employee can be . . . engaged in protected activity—although the employee is not contemplating bringing a *qui tam* suit, is not even aware that there is such a thing as a *qui tam* action, and has no idea whether his—the employee's investigation or other acts, if made known to the government, might cause the Attorney General to sue his employer under the False Claims Act." *Schweizer*, 677 F.3d at 1238.

As the D.C. Circuit has explained, section 3730(h) provides "protect[ion] [against retaliation] for employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." *Yesudian*, 153 F.3d at 740. Indeed, evidence of resubmission of a claim from MM to the federal government is "the kind of information a plaintiff normally cannot acquire until he files a [*qui tam*] suit and obtains the benefit of court-sanctioned discovery." *Id.* at 740. In *Yesudian*, the D.C. Circuit explained that given Plaintiff's knowledge of Howard's finances, "it would have been reasonable to conclude there was a 'distinct possibility' he would find evidence of resubmission of the claims." *Id.* at 740.

Likewise, here, Plaintiffs' personal knowledge that the substantial majority of MM's funding came from federal grants, coupled with Ms. Boone's specific assertion to the MM board that she was covering the improper use of SBA funds is sufficient to demonstrate that Plaintiffs' investigation reasonably could have led to a FCA action. Plaintiffs raised their concerns about the misuse of the debit card to the MM's CPA, lawyer, and board. *See United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1240 (D.C. Cir. 2012) (holding that Plaintiff gathering evidence that employer defrauded federal agencies, sharing that evidence with her superiors, and warning the employer of FCA liability is "a classic example of protected activity"); *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 741 n.9 (D.C. Cir. 1998) (noting that several courts have found internal reporting of false claims to be an example of protected activity).

Accordingly, the Court concludes that Plaintiffs have pled sufficient facts for a reasonable jury to conclude that Plaintiffs engaged in protected activity within the meaning of section 3730(h).

### B. *Adverse Employment Actions & Evidence of Retaliation*

The Court now turns to the issues of whether Plaintiffs' were subject to adverse employment actions and, if they were, whether the actions were taken in retaliation for Plaintiffs' reports to the MM board. Plaintiffs each argue that they were demoted and either terminated or constructively terminated in retaliation for reporting Ms. McComas to the MM board. *See* Pls.' Opp'n at 36-38. In support of this argument, Plaintiffs present evidence that they purport demonstrates that Ms. McComas had a retaliatory animus towards them because they reported her to the board. *See id.* Defendant asserts that Plaintiffs failed to establish in most instances that they were subject to adverse employment actions and failed to demonstrate that any alleged employment action was done in retaliation for Plaintiffs' reports to the board. Def.'s Mot. at 15-21. The Court shall address each alleged adverse employment action in turn.

### 1. *Relevant Legal Standard*

"[C]laims of retaliation are governed by the *McDonnell Douglas* burden-shifting scheme." *Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)). Under the *McDonnell Douglas* paradigm, Plaintiffs have the initial burden of proving by a preponderance of the evidence a *prima facie* case of retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To prove unlawful retaliation, Plaintiffs must show that (1) they were engaged in statutorily protected activity; (2) MM took a materially adverse action against them; and (3) a causal connection exists between the two. *United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1240-41 (D.C. Cir. 2012). Here, the Court already has found that Plaintiffs produced sufficient evidence to demonstrate that they were engaged in protected activity.

The Court must first determine whether Plaintiffs' alleged demotions and constructive discharges were adverse employment actions. "[A]n employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Czekalski v. Lahood*, 589 F.3d 449, 454 (D.C. Cir. 2009) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)). In the retaliation context, an "adverse action" has a broader meaning than in a discrimination context. *Baird v. Gotbaum*, 662 F.3d 1246, 1248-49 (D.C. Cir. 2011). An employment action is materially adverse in the retaliation context if "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

If Plaintiffs succeed in establishing a *prima facie* case, the burden then shifts to MM to articulate some legitimate, non-retaliatory reason for its actions, and to produce credible evidence supporting its claim. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Accordingly, if Defendant produces a legitimate non-discriminatory reason for its actions at the summary judgment stage, "the district court need not—*and should not*—decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)) (internal quotation marks omitted). Accordingly, if MM offers legitimate, non-retaliatory explanation for Plaintiffs' alleged demotions and discharges, the only question for the Court to address is "whether the employee's evidence creates a material dispute on the ultimate issue of retaliation." *Id.* Thus, the Court must review "each of the three relevant categories of evidence—*prima facie*, pretext, and any other—to determine whether they 'either separately or

in combination' provide sufficient evidence for a reasonable jury to infer retaliation." *Id.* at 679

(quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002)).

### 2. *Demotion Claims of Plaintiffs Boone, Barker and Smith*

Following the disclosure to the MM board, MM hired Nancy Leonard,[15] a management

consultant in April 2006 to "evaluate management practices and restructure the organization."[16]

Def.'s Stmt. ¶¶ 24-25. Ms. Leonard submitted a written report to the MM board, dated May 11,

2006, that made several recommendations for the company, including the hiring of a General

Manager. Def.'s Stmt. ¶ 26 (citing Def.'s Ex. 14 at 5, ECF No. [70-14] (Leonard's Report to

MM board)). In June 2006, MM announced the implementation of a new organizational

structure, and, in July 2006, MM hired Mark Kessler as its General Manager. Def.'s Stmt. ¶¶ 27,

29; Pls.' Stmt. ¶ 196 (citing Pls.' Ex. 148, ECF No. [81-7] (Organizational Charts from January

and June 2006)). Plaintiffs allege that Ms. McComas and Ms. Leonard were friends prior to Ms.

Leonard being hired at MM, and that the reorganization recommended by Ms. Leonard was done

in retaliation for Plaintiffs' reports to the board. Pls.' Opp'n at 13-14. The parties raise two

main issues regarding the new organizational structure: (1) whether Plaintiffs were demoted as a

result of the change; and (2) whether the change in organizational structure was implemented in

retaliation for Plaintiffs' protected activity.

---

[15] The Court notes that Ms. Leonard has since changed her name to Nancy McIntyre, however, she is referred to as Nancy Leonard throughout the filings in this case and this Memorandum Opinion.

[16] Plaintiffs purport to dispute the reason why Ms. Leonard was hired, however, their response points to a paragraph within a document that is completely unrelated to Ms. Leonard or her role at MM. Pls.' Controv. Stmt. ¶ 23 (citing Pls.' Ex. 167 ¶ 32, ECF. No. [87-7] (Boone Declaration)).

The Court first turns to the issue of whether Plaintiffs Boone, Smith, and Barker were demoted.[17] A purely lateral transfer that does not involve a demotion either in form or substance does not rise to the level of a materially adverse employment action. *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010) (citing *Brown v. Brody*, 199 F.3d 446, 455-56 (D.C. Cir. 1999)). However, "[l]ateral transfers—those entailing 'no diminution in pay and benefits'—qualify as adverse employment actions if they result in 'materially adverse consequences affecting the terms, conditions, or privileges' of the plaintiff's employment." *Id.* (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003)). Generally, whether or not a particular reassignment of duties constitutes an adverse action is a jury question. *Id.* "[T]he fact-finder must compare the position the plaintiff held before the transfer to the one he holds afterwards . . . . The question, then, is whether a reasonable jury could conclude that the transfer from the former to the latter was adverse." *Id.*

Defendant alleges that Plaintiffs were not demoted because they received the same salary and benefits both before and after the reorganization. Def.'s Mot. at 17. Plaintiffs disagree and argue that the changes in their titles, changes in job responsibilities, and changes to and inconsistent enforcement of MM policies constituted a demotion. Pls.' Opp'n at 36-37.

Prior to the June 2006 reorganization, Ms. Boone held the position of Vice President of Finance, and was Assistant Secretary/Treasurer of MM. After the reorganization, her title was changed to Finance Manager. Pls.' Stmt. ¶ 227 (citing Pls.' Ex. 200 at 226-27, ECF No. [78-1] (Boone Dep., Vol. I)). Plaintiffs allege that in addition to the title change, Ms. Boone was removed as a signatory on three MM bank accounts and relieved of all of her human resources

---

[17] The Court shall analyze Plaintiff Harris's demotion claim separately and, accordingly, the use of the term "Plaintiffs" throughout this section shall only refer to Ms. Boone, Mr. Barker, and Ms. Smith.

duties.  Pls.' Stmt. ¶¶ 208-09 (citing Pls.' Ex. 200 at 227, ECF. No [78-1] (Boone Dep., Vol. I)).

Additionally, Plaintiffs argue that Ms. Boone no longer had supervisory authority over the

Executive Assistant to the Executive Director, and that she was no longer authorized to work

independently of the Executive Director in her absence.  Pls.' Stmt. ¶¶ 213-14, 228 (citing Pls.'

Ex. 200 at 220 (Boone Dep., Vol. I); Pls.' Ex. 15, ECF No. [74-9] (Vice President of Finance –

Job Description)).  Finally, Ms. Boone no longer attended or took minutes at MM board

meetings, nor did she make financial presentations to the board.  Pls.' Stmt. ¶¶ 198, 201-02

(citing Pls.' Ex. 200 at 227, ECF No. [78-1] (Boone Dep., Vol. I); Pls.' Ex. 206 at 89, ECF No.

[87-10] (Carpenter Dep., Vol. I)).

Mr. Barker's title changed from Director of Operations to IT Manager as a result of June

2006 reorganization.  Pls.' Stmt. ¶¶ 259-60, 262 (citing Pls.' Ex. 148, ECF No. [81-7]

(Organizational Charts from January and June 2006)).  Plaintiffs assert that Mr. Barker lost his

supervisory authority over two staff members as a result of the reorganization and that he was

never given a job description for his new role.[18]  Pls.' Stmt. ¶¶ 262, 264 (citing Pls.' Ex. 202 at

120, 164, ECF No. [78-3] (Barker Dep.); Pls.' Ex. at 8, ECF No. [81-10] (Barker's Ans. to Defs.'

1st Set of Interrogatories)).[19]  Plaintiffs allege that Mr. Barker was no longer allowed to make

judgment calls when Ms. McComas was out of the office.  Pls.' Stmt. ¶ 238 (citing Pls.' Ex. 209

at 120, ECF No. [87-11] (Smith Dep., Vol. II)).

---

[18] Plaintiffs' Statement of Material Facts also indicates that "MM removed [Mr. Barker's] authority and duty to supervise . . . the management of three retail facilities."  Pls.' Stmt. ¶ 265. However, the authority cited by Plaintiffs does not support this fact.  *See* Pls.' Ex. 202 at 14, 120, ECF No. [78-3] (Barker Dep.).

[19] This Exhibit is not listed by number because it was not included in Plaintiffs' Corrected Index and Exhibits. *See* Pls.' 2d Errata to Opp'n, ECF No. [99].

After the reorganization, Ms. Smith's title was changed from Retail Director to Purchasing Manager.[20]  Def.'s Stmt. ¶ 5; Pls.' Controv. Stmt. ¶ 5.  Ms. Smith contends that she no longer had control over the MM purchasing budget and was no longer authorized to make decisions for MM when Ms. McComas was out of the office.  Pls.' Stmt. ¶¶ 237-38 (citing Pls.' Ex. 209 at 118, 120 ECF No. [87-11] (Smith Dep., Vol. II)).

The Court finds that a reasonable jury could conclude that the changes in the three Plaintiffs' positions after the June 2006 reorganization were adverse.  Viewing the evidence in the light most favorable to Plaintiff, each Plaintiff was given a less prestigious title after the structural reorganization, from vice president or director to manager.  *See, e.g., Bloom v. McHugh*, 828 F. Supp. 2d 43, 57-58 (D.D.C. 2011) (holding that a manager's refusal to change an employee's job title to a "more distinguished or prestigious" title after a reassignment "plausibly suggests" an adverse action); *cf. Runkle v. Gonzales*, 391 F. Supp. 2d 210, 225 (D.D.C. 2005) (specifically noting that disciplinary actions that have no effect on job title among other things do not constitute adverse actions).  Each Plaintiff also presented evidence of a change in job responsibility as a result of the reorganization, and each Plaintiff was told that he or she no longer had decision-making authority in Ms. McComas's absence. *See generally Pardo-Kronemann v. Donovan*, 601 F.3d 599 (D.C. Cir. 2010) (holding that a reasonable juror could conclude that a reassignment with the same title, pay, and grade, but one that Plaintiff

---

[20] Despite combing the docket for an extended period of time, the Court is unable to locate Ms. Smith's Amended Answers to First Set of Interrogatories listed as Plaintiffs' Exhibits 151, 154, and 179. While Plaintiffs rely on this document to establish that Ms. Smith's title changed from director to manager as a result of the June 2006 reorganization, the Court shall accept this fact for the purposes of addressing Defendant's Motion for Summary Judgment given that the parties presented organizational charts listing Ms. Smith as "Purchasing Manager" after the reorganization. *See* Defs.' Ex. 16, ECF No. [70-16] (Organizational Chart); Pls.' Ex. 148, ECF No. [81-7] (Organizational Charts from January and June 2006). The Court notes that Plaintiffs did file Ms. Smith's Amended Answers to Nos. 16 and 17 of Defendant's First Set of Interrogatories, ECF No. [99-5], but this document does not address her title change.

alleged was a transfer from a legal to a nonlegal job, constituted an adverse employment action); *see also, e.g., Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007) (noting that a reassignment with significantly different job responsibilities may constitute an adverse employment action). Ms. Boone no longer handled human resources and no longer attended or presented at the MM board meetings. Ms. Smith no longer controlled the MM purchasing budget. Mr. Barker alleges that he was altogether unsure of his job responsibilities after the reorganization because he never received a job description. Ms. Boone and Mr. Barker further contend that they were stripped of their supervisory duties. *See, e.g., Peters v. District of Columbia*, 873 F. Supp. 2d 158, 206 (D.D.C. 2012) (citing *Gelta v. Gray*, 645 F.3d 408, 412 (D.C. Cir. 2011)) ("Even if the tangible benefits remain the same, a transfer that involves the permanent withdrawal of an employee's supervisory responsibilities may amount to a demotion and an adverse employment action."). Taking this evidence as a whole, the Court concludes that Plaintiffs raised a genuine issue as to whether they were demoted as a result of the reorganization.

Applying the *McDonnell Douglas* framework, the Court next turns to Defendant's proffered evidence that the alleged demotions were motivated by a legitimate, nondiscriminatory reason. *See United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1240-41 (D.C. Cir. 2012). Defendant contends that the organizational changes resulting in the alleged demotions were made with the specific intent of addressing management concerns raised by Plaintiffs in their letters to the MM board and not in retaliation for their reports to the MM board. Def.'s Mot. at 17 n.4.

Plaintiffs make several arguments to demonstrate that the restructuring was done in retaliation for their reports to the board. Plaintiffs point to temporal proximity of the reports to the board and the reorganization, the friendly relationship between Ms. Leonard who proposed

the restructuring and Ms. McComas, and other policy changes made around the same time to support their argument that the alleged demotions were retaliatory acts. First, Plaintiffs note that the alleged demotions took place three months after their reports were made to the MM board. Pls.' Opp'n at 38. The temporal proximity of Plaintiffs' report to the board and the reorganization is some indication of causation. *See, e.g., Hamilton v. Geithner*, 666 F.3d 1344, 1357-58 (D.C. Cir. 2012) (noting that D.C. Circuit has not adopted a bright-line "three-month" rule that less than a three-month period between protected activity and the adverse employment action alone is sufficient to establish causation); *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) (noting that positive evidence beyond temporal proximity is required to rebut a proffered explanation as pretext).

Second, Plaintiffs also assert that Ms. Leonard, the author of the report recommending the restructuring, was acting in concert with Ms. McComas. Plaintiffs allege that Ms. Leonard was friends with Ms. McComas prior to being hired as a consultant by MM. Pls.' Stmt. ¶ 161 (citing Pls.' Ex. 200 at 207, ECF No. [78-1] (Boone Dep., Vol. I); Pls.' Ex. 203 at 171, ECF No. [78-4] (Harris Dep.)). In addition, Plaintiffs point to events that they allege establish that Ms. Leonard had knowledge of Plaintiffs' reports to the board. Plaintiffs allege that Ms. McComas and Ms. Leonard were present at a managers' meeting in April 2006 where Ms. McComas discussed the use of the debit card for personal expenditures, the board's investigation, and resulting changes in MM's policies. Pls.' Stmt. ¶ 441 (citing Pls.' Ex. 167 at ¶ 40, ECF No. [87-7] (Boone Declaration)). Plaintiffs assert that during another meeting with Ms. Leonard present on May 23, 2006, Ms. McComas expressed to Plaintiffs that she was hurt that Plaintiffs reported her to the board without directly talking to her first. Pls.' Stmt. ¶ 341 (citing Pls.' Ex. 204 at 50, ECF. No [83-2] (Leonard Dep.)). Plaintiffs also allege that during that meeting, Ms. Leonard

pointed at Plaintiffs and stated, "If you don't keep everything confidential that's going on here, I will fire your asses." Pls.' Stmt. ¶ 184 (citing Pls.' Ex. 200 at 205, ECF. No. [78-1] (Boone Dep., Vol. I)). Finally, Plaintiffs claim that Ms. Leonard told Plaintiffs they "ganged up on [Ms. McComas] and it's [their] fault that the family atmosphere had to leave, . . . it was collusion . . . ." Pls.' Stmt. ¶ 187 (quoting Ex. 200 at 206, ECF No. [78-1] (Boone Dep., Vol. I)).

Plaintiffs also rely on statements within Ms. Leonard's written report to demonstrate that Ms. Leonard was influenced by Ms. McComas. Plaintiffs take issue with the fact that Ms. McComas is the only MM employee whom the report specifically recommends should be retained, and described her as having "done an excellent job in building the reputation of MountainMade . . . ." Pls.' Stmt. ¶¶ 176-78 (citing Pls.' Ex. 34 at 5, 8, ECF No. [81-1] (Leonard's Report)). In contrast, the report indicates that, "[t]he majority of the problems arise from the fact that many of the employees are young and inexperienced . . . ." Pls.' Stmt. ¶ 181 (citing Pls.' Ex. 34 at 4, ECF No. [81-1] (Leonard's Report)).

Finally, Plaintiffs point to several MM policy changes that were implemented after their reports to the board in May 2006. In May 2006, Plaintiffs' paid one-half hour lunch break was replaced with a one-hour unpaid lunch break. Pls.' Stmt. ¶¶ 217, 221-22 (citing Pls.' Ex. 200 at 193-94, 197, ECF No. [78-1] (Boone Dep., Vol. I)). Plaintiffs also were not allowed to take lunch at the same time. Pls.' Stmt. ¶¶ 217-18 (citing Pls.' Ex. 200 at 193-94, ECF No. [78-1] (Boone Dep., Vol. I)). Further, Plaintiffs were no longer allowed to work flex time and, as a result, were required to work the set hours of 8:00 a.m. to 5:00 p.m. each day. Pls.' Stmt. ¶ 217 (citing Pls.' Ex. 200 at 193, ECF No. [78-1] (Boone Dep., Vol. I)). A new sign in/sign out policy was implemented as well. Pls.' Stmt. ¶ 220 (citing Pls.' Ex. 200 at 279, ECF No. [78-1] (Boone Dep, Vol. I)). Plaintiffs allege that the set work schedule and the sign in/sign out policy only

were enforced against them and not imposed against other employees.  Pls.' Stmt. ¶¶ 217, 220 (citing Pls.' Ex. 200 at 193, ECF No. [78-1] (Boone Dep., Vol. I); Pls.' Ex. 208 at 110, ECF. No [87-11] (Smith Dep., Vol. II)).  In July 2006, Plaintiffs were reimbursed for their loss due to the change in the lunch policy and their paid lunch breaks were restored because the Personnel Manual dictated that they were entitled to a half-hour paid lunch and flex time.  Pls.' Stmt. ¶ 223 (citing Pls.' Ex. 200 at 195, ECF No. [78-1] (Boone Dep., Vol. I)).[21]  Taken as a whole, Plaintiffs' evidence lends support to their argument that their job changes were done in retaliation for their reports to the MM board.

Defendant argues that Plaintiffs have the burden of establishing that the retaliation was the "but for" cause of their constructive termination.  Def.'s Reply at 9.  Defendant relies on the Supreme Court's decision handed down on June 24, 2013, in *University of Texas Southwestern Medical Center v. Nassar*, --- U.S. ---, 133 S. Ct. 2517 (2013), in support of its argument.  In *Nassar*, the Supreme Court held that plaintiffs in Title VII retaliation actions must meet the but-for, rather than the motivating-factor, standard for causation.  *Id.* at 2532-33.  Defendant also points to one case from another court in this district that held that the Supreme Court's reasoning in *Nassar* was applicable to the FCA context and accordingly, plaintiffs bringing retaliation claims under the FCA must establish that retaliation for plaintiffs' protected activity was the but-

---

[21] To the extent that Plaintiffs appear to be making this argument, the Court concludes that the changes in MM policies do not rise to the level of being independent adverse employment actions, particularly in light of the fact that Plaintiffs acknowledge that they were reimbursed for the time that they were not given a paid lunch. *See Glenn v. Williams*, No. 98-1278 (CKK), 2006 WL 401816 (D.D.C. Feb. 21, 2006), *aff'd sub. nom. Dickens v. Dep't of Consumer & Regulatory Affairs*, 298 Fed. App'x 2, 3 (D.C. Cir. 2008) (holding that the denial of a flex time claim or changes to a normal work schedule generally are not adverse employment actions if there is no change in pay or a showing of a particularly vulnerability to the change on the part of an employee).  However, the Court shall accept the implementation of the policies and their alleged selective enforcement against Plaintiffs as some evidence of Defendant's alleged retaliatory animus towards Plaintiffs.

for cause of the adverse employment action. *United States ex rel. Schweizer v. Océ N. Am., Inc.*, 956 F. Supp. 2d 1, 13-14 (D.D.C. 2013).

Plaintiffs seek leave to file a surreply to address this argument as it was initially raised in Defendant's reply, since both *Nassar* and the district court opinion were handed down after the filing of Defendant's Motion for Summary Judgment. Given that this new argument was raised in Defendant's reply, the Court finds that Plaintiffs are entitled to respond to the argument. Accordingly, Plaintiffs' [95] Motion for Leave to File Surreply is GRANTED and the Court has considered Plaintiffs' Surreply Memorandum in reaching its decision.[22] *See* Pls.' Surreply, ECF No. [95-3]. In their surreply, Plaintiffs argue that the D.C. Circuit already has adopted a motivating-factor standard to FCA retaliation claims and assert that this holding is binding on this Court. *See United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1237 (D.C. Cir. 2012) (noting that the proper inquiry is whether "the employer's adverse action against the employee [was] 'motivated, at least in part, by the employee's engaging in [that] protected activity'").

The Court finds that it is not necessary at this phase to determine which standard is proper because Plaintiffs' claims related to their alleged demotions would succeed under either the motivating-factor burden or the heightened but-for burden of causation. Here, the parties' factual dispute centers around whether MM's reorganization was done to address management and leadership issues raised by Plaintiffs in their reports, or whether the reorganization was the sham reason given to demote Plaintiffs in retaliation for their reports to the board. Viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have presented enough evidence for a reasonable juror to infer that but for Plaintiffs' protected activity, they would not have been

---

[22] The Court also considered Defendant's [97] Memorandum in Opposition to Plaintiffs' Motion for Leave to File Surreply, and Plaintiffs' [98] Reply thereto.

allegedly demoted.  Accordingly, Defendant is not entitled to summary judgment on the claims of the alleged demotions of Ms. Boone, Mr. Barker, and Ms. Smith.

### 3.  *Demotion Claim of Plaintiff Harris*

Next, Ms. Harris claims that she was demoted in retaliation for her report to the MM board.  Pls.' Opp'n at p. 17-18.  The Court notes that the majority of Plaintiff Harris's argument in the Statement of Material Facts related to Ms. Harris's alleged demotion focuses on evidence contained in two documents, Ms. Harris's deposition transcript and a declaration signed by Ms. Harris.  After scouring the record, it appears that Plaintiff only filed the transcript from the second day of Ms. Harris's deposition and the second page of her declaration, neither of which provide the majority of the cited authority for this claim.  *See* Pls.' Ex. 168, ECF No. [82-2] (Harris Declaration); Pls' Ex. 203, ECF No. [78-4] (Harris Dep., Vol. II).   Accordingly, the Court shall address material facts related to Ms. Harris's alleged demotion that are included in Plaintiffs' Statement of Material Facts and that are properly cited to exhibits filed with the Court. *See, e.g., Veitch v. England*, 471 F.3d 124, 133 (D.C. Cir. 2006), *cert. denied sub. nom. Veitch v. Winter*, 552 U.S. 809 (2007) ("Although he is entitled as the non-moving party to the benefit of all reasonable inferences, he cannot rely in opposing summary judgment on mere allegations in his unsworn complaint, much less on assertions made in his brief on appeal; the court may consider only sworn statements setting forth specific facts.").  Further, the Court shall not consider factual assertions made in the Opposition that are not included as part of either Plaintiffs' Controverted Statement of Material Facts or Plaintiffs' Statement of Material Facts.

Here, Defendant alleges that the base salary of Ms. Harris was not changed as a result of the structural reorganization of MM in June 2006.  Def.'s Stmt. ¶ 29.  The Court shall accept this fact a conceded since Plaintiff does not rebut the allegation.  *See* Pls.' Stmt. ¶ 27 (pointing to

evidence to rebut this statement of material fact as it relates to the other three Plaintiffs, but not Plaintiff Harris).  The only material facts presented by Plaintiff and related to Ms. Harris's alleged demotion that are properly cited to exhibits are: (1) Prior to Ms. Harris's report to the board, Ms. Harris was aware that Ms. McComas did not renew the contracts of two of her former finance managers, Susan Odell and Pam Corey, both of whom pushed Ms. McComas to provide receipts for debit card purchases, Pls.' Stmt. ¶ 59 (citing Pls.' Ex. 206 at 47-49, 57-58, ECF No. [79-3] (Smith Dep., Vol. I)); and (2) Ms. McComas barred Ms. Harris from The Gallery,[23] Pls.' Stmt. ¶ 285 (citing Pls' Ex. 203 at 162, ECF No. [78-4] (Harris Dep., Vol. II)).  All other facts provided in Plaintiffs' Controverted Statement of Material Facts or Plaintiffs' Statement of Material Facts are cited to authority not provided to the Court as exhibits.

In order to determine whether a change in position constitutes an adverse employment action, the fact-finder must compare Ms. Harris's position prior to her transfer and after her transfer in order to determine if the transfer constituted an adverse employment action.  *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010).  Here, the record is completely devoid of facts that a reasonable juror could rely on to compare Ms. Harris's position both before and after her reports to the MM board about Ms. McComas.  Even viewing the evidence in the light most favorable to Plaintiff, there is no evidence before the Court that Plaintiff actually suffered any sort of job change.  In fact, her pay remained the same both before and after her report to the MM board.  The Court finds that a reasonable juror could not conclude that Ms. Harris suffered from an adverse employment action based on transfers of positions, solely relying on the fact that she was barred from The Gallery, without any specific facts about how

---

[23] The Court notes that Plaintiffs' Statement of Material Facts indicates in one place that Ms. Harris was barred from The Gallery and in another place that she was barred from the Country Store.  *See* Pls.' Stmt. ¶¶ 285, 291.

this affected her ability to perform her job function, and on her knowledge that Ms. McComas previously did not renew contracts for two former finance managers who asked for receipts from Ms. McComas for her debit card purchases.  Even construing the evidence in the light most favorable to Ms. Harris, the Court there is no factual record upon which a reasonable jury could conclude that Ms. Harris was demoted and, thus, subject to an adverse employment action. *See GE v. Jackson*, 595 F. Supp. 2d 8, 36 (D.D.C. 2009), *aff'd* 610 F.3d 110 (D.C. Cir. 2010) (noting that at summary judgment self-serving, conclusory statements are of minimal value). Accordingly, Defendant is entitled to summary judgment on Ms. Harris's claim related to her alleged demotion.

### 4. *Constructive Termination Claim of Plaintiff Boone*

In addition to the alleging that she was demoted, Plaintiff Boone also asserts that she was constructively terminated from MM.  On January 2, 2007, Ms. Boone submitted a letter of resignation, announcing her resignation effective on January 15, 2007.  Def.'s Stmt. ¶ 34; Pls.' Controv. Stmt. ¶ 32.  Ms. Boone asserts that she was constructively terminated from her position at MM because of her working conditions.  Pls.' Opp'n at 16.  Defendant asserts that Ms. Boone voluntarily resigned and accordingly, cannot establish that she was subject to an adverse employment action.  Def.'s Mot. at 18.

Generally, resignations are presumed to be voluntary.  *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006).  "The test for constructive discharge is an objective one: whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances." *Aliotta*, 614 F.3d at 566. To establish constructive discharge based on a hostile work environment, Plaintiffs like Ms. Boone must first establish a hostile work place by showing behavior "'sufficiently severe or

pervasive to alter the conditions of [their] employment.'" *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Ms. Boone then must make an additional showing "that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Id.* at 134. Indeed, "the standard for constructive discharge is quite high." *Veitch*, 471 F.3d at 134. "[A constructive discharge] does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive, even if the employer's misbehavior creates the unpleasantness or . . . its largesse affirmatively increases the appeal of the employee's alternatives." *Taylor v. FDIC*, 132 F.3d 753, 766 (D.C. Cir. 1997).

The Court finds that Ms. Boone has failed to present sufficient evidence for a reasonable juror to conclude that she was constructively discharged from MM and, accordingly, Ms. Boone's resignation does not amount to an adverse employment action. Ms. Boone argues that she was constructively discharged based on: (1) the alleged demotion and change in job responsibilities; (2) the change in MM lunch, flextime, and sign in/out policies; (3) Ms. McComas's treatment of Ms. Boone after Ms. Boone's report to the board; (4) Ms. Leonard's treatment of Ms. Boone; and (5) Mr. Kessler's treatment of Ms. Boone.

As the Court already has found that Ms. Boone has an actionable claim for her alleged demotion, the Court now turns to the issue of whether the title change and change in job responsibilities coupled with Plaintiffs' other cited evidence are sufficient for a juror to conclude that a reasonable person in Ms. Boone's position would have resigned. "In determining whether a hostile work environment claim is substantiated, a court must look at all the circumstances of the plaintiff's employment, specifically focusing on such factors as the frequency of the discriminatory conduct, its severity, whether it was threatening and humiliating or merely

offensive, and whether it unreasonably interfered with the employee's work performance." *Sewell v. Chao*, 532 F. Supp. 2d 126, 142 (D.D.C. 2008). "As a general matter, this jurisdiction frowns on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim." *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007), *aff'd sub. nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008). However, there is no *per se* rule barring Plaintiff from claiming that the incidents surrounding her actionable constructive demotion claim coupled with the other cited events establish a hostile work environment claim. *Mason v. Geithner*, 811 F. Supp. 2d 128, 178 n.72 (D.D.C. 2011), *aff'd* 492 Fed. App'x 122 (D.C. Cir. 2012). Indeed, "[o]n some occasions, it may be entirely appropriate for an incident to double as an independently actionable act and as a component-act of a hostile work environment." *Id.*

In addition to the alleged demotion, change in job responsibilities, and change in MM policies, Plaintiff Boone presents the following specific facts to support her claim that she was constructively discharged. After their reports to the board, Ms. McComas shunned Ms. Boone and would not talk to her. Pls.' Stmt. ¶ 231 (citing Pls.' Ex. 200 at 222, ECF No. [78-1] (Boone Dep., Vol. I)). Instead, Ms. Boone was told that if she wanted to speak to Ms. McComas, she should go through her executive assistant. *Id.* Ms. Boone, along with Ms. Smith, were not invited to an MM Christmas party in December 2006.[24] Pls.' Stmt. ¶ 230 (citing Pls.' Ex. 200 at 241-42, ECF No. [78-1] (Boone Dep., Vol. I)).

Ms. Boone also points to acts allegedly done by Ms. Leonard. Specifically, Ms. Boone was written up for insubordination by Ms. Leonard on June 1, 2006, after Ms. Boone did not document a verbal warning that Ms. Boone gave to Ms. Harris. Pls.' Stmt. ¶ 172 (citing Pls.' Ex.

---

[24] Plaintiffs Barker and Harris were no longer employed by MM at that time.

46, ECF No. [76-1] (Leonard report regarding Boone insubordination)). Further, Plaintiff alleges

that Ms. Leonard referred to her and other Plaintiffs as "boys and girls," and that Ms. Leonard

told Ms. Boone, "I'm a Ph.D. and you're a child, . . . you are not allowed to tell me things or talk

to me like that." Pls.' Stmt. ¶¶ 173, 186 (citing Pls.' Ex. 200 at 206, 278, ECF No. [78-1]

(Boone Dep., Vol. I)). Plaintiff further asserts that Ms. Leonard belittled and humiliated Ms.

Boone in front of staff. Pls.' Stmt. ¶ 379 (citing Pls.' Ex. 201 at 382, ECF No. [78-2] (Boone

Dep., Vol. II)). Finally, Ms. Boone reported that when Mr. Kessler was hired, he did not speak

to her either. Pls.' Stmt. ¶ 370 (citing Pls.' Ex. 201 at 363, ECF No. [78-2] (Boone Dep., Vol.

II)).

Ms. Boone also alleges in her own declaration that she was: shunned; embarrassed in

front of colleagues; demoted; denied flex time; denied paid lunch breaks and the right to have

lunch with other employees of her choosing; not invited to offsite meetings; demeaned with

insulting and intimidating remarks; called out at a meeting and threatened to be fired; singled out

and asked if she had improperly used the MM debit card for personal purchases; harangued in

front of staff for making disclosures to the board; instructed to remain loyal to Ms. McComas

and MM; put down and humiliated in front of staff; had supervisory duties, important

responsibilities and titles taken away, damaging her career opportunities; not invited to employee

lunches and to Ms. McComas's home; and terminated or forced out after her duties and

responsibilities were taken away. Pls.' Stmt. ¶ 195 (citing Pls.' Ex. 167 at 1-2, ECF No. [87-7]

(Boone Declaration)). To the extent that Ms. Boone in her declaration makes additional claims

such as the fact that she was not invited to offsite meetings, the Court relies on the specific

incidents laid out in Plaintiff's Statement of Material Facts under the heading "Boone's

Demotion and Materially Adverse Actions" that can be traced to and supported by the cited exhibits. *See* Pls.' Stmt. ¶¶ 196-231.

Plaintiff has failed to demonstrate that the atmosphere at MM was that of an intolerable work environment such that the alleged conduct was sufficiently pervasive or severe to warrant Ms. Boone's constructive discharge claim based on a hostile work place. "'[P]laintiff must show far more than . . . criticisms[] and snubs or perceived slights to establish a hostile work environment.'" *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 7 (D.D.C. 2012) (quoting *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 82 (D.D.C. 2007)). Indeed, the anti-retaliation provision of the FCA does not impose "'a general civility code for the American workplace.'" *Id.* at 6. While there is no bright line rule for determining when component-acts should be considered collectively, the court must make its determination on a case-by-case basis. *Mason v. Geithner*, 811 F. Supp. 2d 128, 178 (D.D.C. 2011). "[C]ourts must consider the extent to which the alleged actions are related in time and type; if certain actions are so remote in time or different in kind that a reasonable trier of fact could not find them to be part of the same work environment, then those actions should not be considered." *Id.*

The incidents cited by Plaintiff span the period of time from her disclosure to the board in March 2006 to her resignation in January 2007. *See Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (noting that the timeline events as a whole is considered to determine the severity and pervasiveness of the events). However, the majority of the *specific* events cited by Ms. Boone appear to have occurred between March 2006 and July 2006. As previously discussed, the changes in MM's lunch, flex time, and signing in/out policies were implemented in May 2006 and, in July 2006, Plaintiffs were reimbursed for their unpaid lunch breaks during

that period of time. Further, the reorganization that resulted in the change in Plaintiffs' job titles and job responsibilities occurred in June 2006.

Ms. Boone allegedly was told to communicate with Ms. McComas through her Executive Assistant in June 2006.[25] *See* Pls.' Ex. 200 at 222, ECF No. [78-1] (Boone Dep., Vol. I). Further, Ms. Boone appears to assert that Ms. McComas stopped speaking to her after her disclosure to the board and that this continued throughout the remainder of her employment at MM. All incidents involving Ms. Leonard, namely her statements to Ms. Boone and her write-up of Ms. Boone alleging insubordination, appear to have occurred while Ms. Leonard was at MM as a consultant, which roughly spanned from April 2006 to July 2006 when Mr. Kessler was hired. The Court also notes with regard to the write-up of Ms. Boone for insubordination, Ms. Boone does not appear to refute that she did indeed refuse to provide documentation of a verbal warning that she gave to Ms. Harris and does not allege that the write-up had any effect on her employment other than, perhaps, that it was placed in her personnel file. *See, e.g., Runkle v. Gonzales*, 391 F. Supp. 2d 210, 225-226 (D.D.C. 2005) (holding that formal letters of admonishment and disciplinary notices with no effect on employee's salary, duties, benefits or hours do no constitute adverse employment actions). Ms. Boone's only claim related to Mr. Kessler, who was hired in July 2006, was that he did not talk to her. The following cited events occurred in the months leading up to Ms. Boone's resignation, between August 2006 and January 2007: Ms. Boone was not invited to the Christmas party in December 2006; Ms. McComas and Mr. Kessler did not talk to Ms. Boone; Ms. Boone had to sign in and out of the office; Ms. Boone no longer could use flextime; and Ms. Boone could not each lunch with the other

---

[25] While Plaintiffs' Statement of Material Facts indicates that this event occurred in May 2006, Ms. Boone states that it was June 2006 in her deposition. Pls.' Stmt. ¶ 231 (citing Pls.' Ex. 200 at 222, ECF No. [78-1] (Boone Dep., Vol. I)).

Plaintiffs. Looking at these facts as a whole, including those previously discussed in relation to Ms. Boone's alleged demotion and the additional pleaded facts related to the constructive discharge claim, the alleged incidents do not appear sufficiently related in time or type to collectively support Ms. Boone's claim of constructive discharge. While Plaintiff alleges some ongoing conduct as noted, the only specific incident that occurred during the last five months of Ms. Boone's employment was that she was not invited to the Christmas party. These facts are simply insufficient for a reasonable jury to conclude that Ms. Boone was constructively discharged from MM.

Even if the Court were to accept that the alleged events have a sufficient "common thread" through them to provide a coherent claim, the Court finds that Plaintiff still fails to present evidence sufficient for a reasonable juror to conclude that Ms. Boone was forced to resign due to a hostile work place as Ms. Boone has alleged conduct that is neither sufficiently persuasive or severe. *Mason v. Geithner*, 811 F. Supp. 2d 128, 178 (D.D.C. 2011); *see also Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014). Putting aside Plaintiffs' claims related to the change in job title and responsibility which the Court has concluded are actionable, "[e]ach event that [Ms. Boone] identifies as an example of abusive conduct fails to add materially to the alleged aura of hostility." *See Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014).

In *Singh v. United States House of Representatives*, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004), another court in this district addressed plaintiff's Title VII claim that she was subjected to hostile and discriminatory treatment throughout her employment. The court held that plaintiff who alleged that she was frozen out of important meetings, humiliated at meetings that she did attend, yelled at and told to "shut up and sit down" by her supervisor, treated as invisible by her

supervisor, overlooked at staff meetings, and isolated from other staff members, failed to present sufficient evidence for a reasonable jury to conclude that she established a hostile work environment claim. *Singh*, 300 F. Supp. 2d at 54-57; *see also, e.g., Peters v. District of Columbia*, 873 F. Supp. 2d 158, 206 (D.D.C. 2012) (noting that the fact that plaintiff felt humiliated does not make plaintiff's assignment to a temporary detail an adverse employment action). The court further noted that plaintiff's allegations, which centered around plaintiff's allegedly "hostile, patronizing, and frequently abusive" supervisor did not amount to severe and pervasive treatment sufficient to alter the conditions of her employment. *Singh*, 300 F. Supp. 2d at 54-56. Here, Plaintiff's claim centers around the treatment of Ms. Boone by Ms. McComas, Ms. Leonard, and Mr. Kessler. The fact that Ms. Boone was ignored and "belitted" by Ms. McComas, Ms. Leonard, and, to a lesser extent, Mr. Kessler, and was not invited to certain events falls short of showing the sort of behavior necessary to support a constructive discharge claim. Indeed, Plaintiff herself seems to concede that shunning by a supervisor is not enough to demonstrate a hostile work environment but may be considered some evidence of a hostile work environment. *See* Pls.' Opp'n at 30. To the extent that Plaintiff seems to rely on her own feelings that she was humiliated and insulted as listed in her declaration, the Court notes that while Plaintiff's own feelings are relevant to whether Plaintiff found the environment at MM hostile, the purported effects of the actions are just one factor to take into account when determining whether the environment was objectively hostile. *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 28 (D.D.C. 2009) (noting that "unsubstantiated allegations of emotional distress, humiliation, anxiety, depression, physical illness" without more evidence are insufficient to support a hostile and abusive work environment). Here, the Court finds insufficient evidence for a reasonable jury to conclude that the alleged conduct was sufficiently pervasive and severe to

demonstrate that it was objectively hostile based on the cited incidents. Accordingly, the Defendant is entitled to summary judgment on the claim that Ms. Boone was constructively discharged from MM.

## 5. *Constructive Termination Claim of Plaintiff Harris*

The next issue before the Court is whether Plaintiff Harris has pled sufficient facts to demonstrate that she may have been subjected to an adverse employment action when she stopped working at MM and became a full-time student. Ms. Harris asserts that she was constructively discharged when Defendant would not accommodate her school schedule. Plaintiff's statement of relevant facts follows. Ms. Harris planned to return to school in the Fall of 2006. Prior to the report to the board, she was told by Ms. McComas that MM would work around her schedule so that Ms. Harris could work part-time while attending school. Pls.' Stmt. ¶ 325 (citing Ex. 203 at 172, ECF No. [78-4] (Harris Dep., Vol. II)). After she gave the report to the board, Ms. Harris received her class schedule and provided it to Mr. Kessler who told her that MM would work around her schedule. Pls.' Stmt. ¶ 326 (citing Ex. 203 at 172-73, ECF No. [78-4] (Harris Dep., Vol. II)). Mr. Kessler then went to speak to Ms. McComas and later that day, he told Ms. Harris that there was no way that MM could accommodate Ms. Harris's school schedule and that she would have to work the hours assigned to her. Pls.' Stmt. ¶ 327 (citing Ex. 203 at 173, ECF No. [78-4] (Harris Dep., Vol. II)). In the Fall of 2006, Ms. Harris stopped working at MM because she became a full-time student and MM would not accommodate her schedule. Def.'s Stmt. ¶ 33; Pls.' Controv. Stmt. ¶ 31.

The standard for judging harm relies on the reactions of a reasonable employee. An objective standard is employed because "the significance of any given act of retaliation will often depend upon the particular circumstances." *Burlington Northern & Santa Fe Ry. v. White*, 548

U.S. 53, 69 (2006); *see also Hunter v. D.C. Child & Family Servs. Agency*, 710 F. Supp. 2d 152, 160 (D.D.C. 2010), *aff'd* No. 13-7003, 2013 WL 5610262 (D.C. Cir. Sept. 27, 2013) (noting that "whether an alleged adverse action produces any actual objectively tangible harm, . . . depends on the circumstances of the case").  The Seventh Circuit has held that changes in schedule not affecting pay or opportunities for promotion generally are not actionable.  However, the Seventh Circuit has recognized an exception where, "employer exploits a known vulnerability of an employee . . . [such that] a change in assignments, like an altered work schedule, conceivably might amount to an adverse employment action."  *Jones v. Nat'l Council of YMCA of the United States*, No. 09 C 06437, 2014 WL 2781579, at *39 (N.D. Ill. June 18, 2014) (quoting *Vance v. Ball State Univ.*, 646 F.3d 461, 474 (7th Cir. 2011)).  For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." *Burlington Northern*, 548 U.S. at 69. The Court finds this approach instructive in the instant matter.

The Court finds that Plaintiff has pled sufficient facts to demonstrate that MM's failure to accommodate Ms. Harris's school schedule, ultimately resulting in the end of her employment at MM, may have been an adverse employment action.  Viewing the evidence in the light most favorable to Plaintiff prior to the report to the board, Ms. Harris was told by Ms. McComas that she could continue to work at MM while attending school and that MM would adjust her part-time schedule so that she could attend class which Ms. Harris relied on.  Ms. Harris enrolled in classes. After her report to the board, she presented her schedule to Mr. Kessler, only to be told that MM would not accommodate her school schedule after he spoke to Ms. McComas. At this point, she was faced with the decision to either attend school as planned or continue to work at MM.  Plaintiff's version of facts also demonstrates the requisite showing of causation.  Ms.

Harris first was told by Mr. Kessler that MM would accommodate her schedule, but only after Mr. Kessler consulted Ms. McComas was Ms. Harris told that MM would not schedule her work hours around her school schedule. Defendant's proffered legitimate, nondiscriminatory reason to end Ms. Harris's employment is that "Ms. Harris could not continue working her regular hours when she became a full-time student, and therefore resigned." Def.'s Reply at 6. Defendant presents no evidence that MM was unable to accommodate Ms. Harris's continued employment in light of her school schedule. The Court finds that a reasonable jury could infer that Ms. Harris was constructively discharged from MM in retaliation for her report to the board based on all of the evidence presented. *See Quiroz v. Hartgrove Hosp.*, No. 97 C 6515, 1999 WL 281343 (N.D. Ill. Mar. 25, 1999) (denying summary judgment when plaintiff alleged that her employer moved her shift to accommodate her school schedule and refused to move her shift back after classes were finished which was the arrangement that she anticipated); *but see Long v. First Union Corp.*, 894 F. Supp. 933 (E.D. Va. 1995), *aff'd* 86 F.3d 1151 (4th Cir. Va. 1996) (holding that while there was sufficient evidence to conclude that plaintiff quit after her employer would not accommodate her school schedule, plaintiff could have remained in her position and worked the hours already assigned to her, and did not establish causation between the refusal to change her schedule and her discrimination claims). The Court further finds that a reasonable jury could conclude that retaliation was the but-for cause of Ms. Harris's constructive discharge. Accordingly, Defendant is not entitled to summary judgment on Ms. Harris's constructive discharge claim.

### 6. *Termination Claim of Plaintiff Barker*

The next issue before the Court is whether Plaintiff Barker has an actionable claim related to his termination from MM. It is undisputed by the parties that Mr. Barker was

terminated from his employment at MM on August 10, 2006. Def.'s Stmt. ¶ 30; Pls.' Stmt. ¶ 302. Plaintiff Barker presents the following account of the events leading up to his termination. On August 9, 2006, MM experienced an issue with its e-mail server. Pls.' Stmt. ¶ 306 (citing Pls.' Ex. 202 at 147, ECF No. [78-3] (Barker Dep.)). Mr. Barker went to the e-mail console that controlled the e-mail system, and determined that the safeguard had been turned off. Pls.' Stmt. ¶ 307 (citing Pls.' Ex. 202 at 147, ECF No. [78-3] (Barker Dep.)). He was unable to fix the problem and reported it to Mr. Kessler. Pls.' Stmt. ¶ 308 (citing Pls.' Ex. 202 at 148, ECF No. [78-3] (Barker Dep.)). Mr. Barker inquired if Byron Sayres, an IT employee of CVI which was another business in the same building as MM, had accessed the e-mail server. Mr. Kessler told Mr. Barker that there would be no reason for Mr. Sayres to access the server. Pls.' Stmt. ¶¶ 309-12 (citing Pls.' Ex. 202 at 146, 148, ECF No. [78-3] (Barker Dep.)). Mr. Barker then went to CVI and directly confirmed with Mr. Sayres that he had not accessed the e-mail server. Pls.' Stmt. ¶ 310 (citing Pls.' Ex. 202 at 148, ECF No. [78-3] (Barker Dep.)).

When Mr. Barker returned to MM, he was told that the website was down. Pls.' Stmt. ¶ 311 (citing Pls.' Ex. 202 at 148, ECF No. [78-3] (Barker Dep.)). After investigating, Mr. Barker determined that the website server had been remotely logged into by Mr. Sayres at an IP address assigned to CVI. Pls.' Stmt. ¶ 313 (citing Pls.' Ex. 202 at 150, ECF No. [78-3] (Barker Dep.)). Mr. Barker then went back to CVI and spoke with Lois, who was CVI's Operations Manager.[26] Pls.' Stmt. ¶¶ 313-15 (citing Pls.' Ex. 202 at 150, ECF No. [78-3] (Barker Dep.)). Mr. Barker explained to Lois what happened and asked Lois if he could trust Mr. Sayres's supervisor to help him determine why someone at CVI had accessed the MM server. *Id.* Lois, in turn, showed Mr. Barker a proposed contract between CVI and MM, whereby MM would outsource its IT services

---

[26] The Court notes that it is unable to locate Lois's last name in any of the submitted documents.

to CVI, meaning specifically to Mr. Sayres and his supervisor. Pls.' Stmt. ¶ 316 (citing Pls.' Ex. 202 at 153, ECF No. [78-3] (Barker Dep.)). The next morning, Mr. Barker presented Mr. Kessler with his evidence that Mr. Sayres had logged into and crashed the MM server. Pls.' Stmt. ¶ 320 (citing Pls.' Ex. 202 at 154, ECF No. [78-3] (Barker Dep.)). Mr. Kessler then told Mr. Barker that he was meeting with Mr. Sayres and would distract him so that Mr. Barker could continue his investigation. Pls.' Stmt. at p. 47 (citing Ex. 202 at 155, ECF No. [78-3] (Barker Dep.)). When Mr. Kessler returned, he told Mr. Barker that he understood that Mr. Barker had implicated Mr. Sayres and his supervisor in a conspiracy. Pls.' Stmt. ¶¶ 321-22 (citing Pls.' Ex. 202 at 155, ECF No. [78-3] (Barker Dep.)). Mr. Kessler asked Mr. Barker if he trusted him and Mr. Barker indicated that he did not have reason to trust him because he had not given him a job description since he started working at MM. Pls.' Stmt. ¶ 323 (citing Pls.' Ex. 202 at 159, ECF No. [78-3] (Barker Dep.)). Mr. Kessler fired Mr. Barker at the end of that work day. Pls.' Stmt. ¶¶ 302, 323-24 (citing Pls.' Ex. 202 at 159, ECF No. [78-3] (Barker Dep.)).

Defendant presents a slightly different version of the facts. Defendant asserts that Mr. Barker accused Mr. Kessler, along with Mr. Sayres, of being involved in a conspiracy to crash the computer server during his conversation with Lois, and when Mr. Kessler confronted Mr. Barker with this information, Mr. Barker admitted making the accusation. Def.'s Stmt. ¶ 30. Defendant offers as its legitimate, nondiscriminatory reason that Mr. Barker was terminated for gross misconduct as a result of this incident. Def.'s Stmt. ¶ 31. Defendant further alleges that at the time that Mr. Kessler made the decision to terminate Mr. Barker's employment, he had no knowledge that Mr. Barker had made reports to the board about Ms. McComas. Def.'s Stmt. ¶ 31-32. Plaintiffs simply counter that "Barker was fired under pretext . . . He was fired for doing his job, and doing it well." Pls.' Opp'n at p. 17.

Given that it is undisputed that Mr. Barker was subject to an adverse employment action when his employment at MM was terminated, the Court turns directly to the issue of causation. The fact that Mr. Barker's employment was terminated five months after he reported Ms. McComas to the board and less than two months after he was allegedly demoted is some evidence of retaliation. However, Plaintiff must present additional evidence in order to rebut Defendant's proffered explanation as pretext. *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007). Plaintiff appears to allege that at least Mr. Kessler and Mr. Sayres conspired to have Mr. Barker fired. Additionally, Plaintiff indicates that this conspiracy was motivated by Mr. Barker's reports to the board.

Other courts have found plaintiff's mere claim that a conspiracy is at play is insufficient to rebut a proffered legitimate, nondiscriminatory reason for the adverse employment action. *See Clemente v. Vaslo*, No. 09-13854, 2010 WL 4636250, at *7 (E.D. Mich. Nov. 5, 2010), *aff'd* 679 F.3d 482 (6th Cir. 2012) (noting that plaintiffs offered only a conspiracy theory in opposition to defendant's stated reason for their terminations when plaintiffs, employees of the Water Division, allegedly were terminated after an internal investigation revealed that they had tampered with their water meters to decrease their registered water usage); *Cole v. N.Y. State Dep't of Corr. Servs.*, Case No. 97-CV-0477E, 2002 WL 31017418, at *7 (W.D.N.Y. Aug. 7, 2002), *aff'd sub. nom. Cole v. United Church of Christ & Assocs.*, 78 Fed. App'x 754 (2d Cir. 2003) (holding that plaintiff failed to rebut the proffered reason that he was terminated for an error in judgment that could have resulted in the death of a patient by offering "conclusory allegations, without any evidentiary support, that [his employer's] asserted non-discriminatory reasons are all untrue and were fabricated as part of a conspiracy to harass him and 'trump' a paper trail to justify his termination"); *but see Branch v. Guilderland Cent. Sch. Dist.*, 239 F.

Supp. 2d 242, 246 (N.D.N.Y 2002) (holding that plaintiff presented sufficient evidence to establish causation in a retaliation claim against his supervisor when one of two employees who had filed a sexual harassment claim against him recanted and alleged that the filing of the claim was his supervisor's idea). For example, in *Alexander v. Biomerieuz*, 270 Fed. App'x 422 (7th Cir. 2008), plaintiff was fired after allegedly being overheard by coworkers threatening to bring a gun to work. The plaintiff argued that the employees fabricated the story about the gun, and that she actually was terminated for complaining about race discrimination. *Id.* at 425-26. The Seventh Circuit explained, "[c]ircumstantial evidence requires a long 'chain of inferences,' and it is only 'if each link is solid' that it suffices to create a genuine issue of fact for trial." *Id.* at 428 (quoting *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006)). The *Alexander* court ultimately held that plaintiff had failed to establish the causal link between her termination and the race discrimination complaint because her argument would require a jury to believe that at least eight employees lied about the gun threat. *Id.* at 426.

Here, Plaintiff has failed to establish the necessary links in the chain of inferences in order to establish a causal connection between his report to the MM board and his termination. The Court first notes that in in order for a reasonable juror to accept Mr. Barker's retaliation theory, he or she would have to believe that at least Mr. Kessler and Mr. Sayres, an employee at a different company, conspired to crash the MM servers in order to create a justification for Mr. Barker to be fired. A reasonable juror further would have to accept that Mr. Kessler, who at the time had been an MM employee for one month and was hired over three months after Plaintiff's report to the MM board, either set this plan in motion or was complicit in a plan to terminate Mr. Barker because Mr. Barker reported Ms. McComas to the MM board.

Most importantly, Plaintiff in no way rebuts with either direct or circumstantial evidence Mr. Kessler's statement that he had no knowledge that Mr. Barker was one of the employees who reported Ms. McComas to the board. Indeed, Plaintiff has only offered that Mr. Kessler, who had been on the job for a short time when he made the decision to fire Mr. Barker, had not met with Mr. Barker as he had done with other employees and had not given him a job description. This simply is insufficient for a reasonable jury to infer either that Mr. Kessler had a retaliatory animus towards Mr. Barker in any way or even that Mr. Kessler was aware of Mr. Barker's report to the board. *See Halasa v. ITT Educ. Servs.*, 690 F.3d 844, 848 (7th Cir. 2012) (holding that plaintiff failed to establish that his protected conduct was connected to the decision to fire him when plaintiff did not present any evidence that the persons who made the termination decision knew of the protected conduct); *McGowan v. Billington*, 281 F. Supp. 2d 238, 249 (D.D.C. 2003) (noting that plaintiff's claim failed because plaintiff offered no evidence of motive when claiming that one person on a hiring panel acted on behalf of the management which had the alleged retaliatory animus, in not selecting plaintiff for a position). Nor does Plaintiff Barker present any evidence that it was actually Ms. McComas, rather than Mr. Kessler who made the decision to terminate Mr. Barker. Indeed, the only evidence presented that might give some inference of Mr. Kessler's motivation to terminate Mr. Barker is the draft contract between MM and CVI. Here, even construing the facts in the light most favorable to Plaintiff, Plaintiff at the very best has established that Mr. Kessler and Ms. Sayres conspired to terminate Mr. Barker's employment so that MM could contract its IT work to Mr. Sayres and CVI. Accordingly, Plaintiff's claim fails and the Court finds that Defendant is entitled to summary judgment on Mr. Barker's claim related to his termination.

### 7. *Termination Claim of Plaintiff Smith*

The Court next turns to the issue of the termination of Ms. Smith. It is undisputed by the parties that Ms. Smith along with three other employees, none of whom made reports about Ms. McComas to the MM board, were terminated from employment at MM on January 5, 2007. Def.'s Stmt. ¶¶ 35-36; Pls.' Controv. Stmt. ¶¶ 33-34. Ms. Smith alleges that her employment was terminated in retaliation for her reports to the board. Pls. Controv. Stmt. ¶ 33 (citing Pls.' Ex. 166 at 3, ECF No. [87-6] (Smith Declaration)). Defendant asserts that Ms. Smith's termination was motivated by a legitimate, nondiscriminatory reason. Specifically, Defendant argues that Ms. Smith and the other employees were terminated "in an effort to sustain [MM's] viability in light of financial problems it was facing." Def.'s Stmt. ¶ 35 (quoting Def.'s Ex. 22, ECF No. [70-22] (Note from Kessler re: Smith Termination)). Plaintiff attempts to demonstrate that this proffered reason is pretextual, by pointing to a declaration completed by Ms. Smith that states: "I was terminated because of my whistleblowing activities by McComas in retaliation for my efforts regarding her fraud. She made the decision, according to Kessler. Money was not an issue in my case." Pls.' Controv. Stmt. ¶ 33 (quoting Pls.' Ex. 166 at 3, ECF. No [87-6] (Smith Declaration)). When Ms. Smith was told by Mr. Kessler that she was being terminated from employment, Ms. Smith asked Mr. Kessler for a reason. Mr. Kessler stated, "This is out of my hands. I'm sorry . . . ." Pls. Stmt. ¶ 254 (quoting Pls.' Ex. 208 at 139, ECF No. [79-3] (Smith Dep., Vol. I)).

Even when viewing the evidence presented in the light most favorable to Plaintiff, the record is devoid of any evidence on which a reasonable jury could rely to establish that Ms. Smith's termination was related to her report to the MM board. Indeed, "a non-movant's allegations that are 'generalized, conclusory and uncorroborated by any evidence other than the

[non-movant's] own deposition testimony' are 'insufficient to establish a triable issue of fact'—at least where the nature of the purported factual dispute reasonably suggests that corroborating evidence should be available." *Brooks v. Kerry*, No. 10-0646(BAH), 2014 WL 1285948, at *8 (D.D.C. Mar. 31, 2014) (citing *Akridge v. Gallaudet Univ.*, 729 F. Supp. 2d 172, 183 (D.D.C. 2010)).  Plaintiff has cited no evidence demonstrating that Defendant's proffered justification for terminating Ms. Smith's employment, namely that the four employees were laid off due to financial problems, was a pretext for Defendant's retaliatory motive.  Ms. Smith's own statement in a written declaration that her employment was not terminated due to financial concerns without any supporting evidence is insufficient to establish a genuine issue of material fact.[27] *See, e.g., Piroty v. Chairman, Broad. Bd. of Governors*, 815 F. Supp. 2d 95, 99 (D.D.C. 2011), *aff'd* No. 11-5292, 2012 WL 1155732 (D.C. Cir. Mar. 7, 2012) ("Such subjective beliefs, of course, are insufficient to create a genuine issue of material fact."); *see also GE v. Jackson*, 595 F. Supp. 2d 8, 36 (D.D.C. 2009), *aff'd* 610 F.3d 110 (D.C. Cir. 2010) (noting that self-serving and uncorroborated declaration is of little value at the summary judgment stage).  Nor is Mr. Kessler's ambiguous statement that the decision to lay off Ms. Smith was "out of his hands," enough to demonstrate that a reasonable jury could conclude that Ms. Smith was terminated in retaliation for her report to the board.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").  Significantly, Plaintiff does not point to any evidence either in the opposition or in

---

[27] Fed. R. Civ. P. 56(c)(4) requires that a "declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  The Court notes that Ms. Smith's declaration provides no factual support for her statement that her termination was not financially motivated nor demonstrates that she had any personal knowledge of MM's financial situation in January 2007.

the Statement of Material Facts to argue that MM was financially stable at the time that Ms. Smith was laid off in January 2007. Additionally, the fact that three employees who did not make reports to the board were laid off at the same time as Ms. Smith lends support to Defendant's assertion that the terminations were financially driven, and is not addressed by Plaintiff in either the opposition or Statement of Material Facts. Accordingly, the Court concludes that Plaintiff Smith has failed to demonstrate a genuine issue of material fact related to the causal link between her report to the board and her termination 10 months later. Defendant is entitled to summary judgment on Ms. Smith's termination claim.

### C. *Wrongful Discharge under State Law*

Plaintiffs also allege that they were wrongfully discharged from MM in violation of public policy under West Virginia law. Plaintiffs Barker and Smith rest their claims upon the termination of their employment by MM, and Plaintiffs Boone and Harris rest their claims on the constructive discharge theory. West Virginia adopts a four-part test to establish a claim for wrongful discharge in contravention of substantial public policy:

> (1) [Whether a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
> (2) [Whether] dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
> (3) [Whether t]he plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
> (4) [Whether t]he employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Swears v. R.M. Roach & Sons, Inc.*, 696 S.E.2d 1, 6 (W. Va. 2010) (quoting *Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713, 723 (W. Va. 2001)). For a retaliatory discharge claim, courts generally must rely on a public policy articulated by the legislature and are to "'proceed cautiously if called upon to declare public policy absent some prior legislative or judicial

expression on the subject.'"  *Id.* at 7 (quoting *Tiernan v. Charleston Area Med. Ctr., Inc.*, 506 S.E.2d 578, 584 (W. Va. 1998)).

Here, Plaintiffs' state law claims are based on Defendant's alleged violation of the False Claims Act.  *See* 2d Amend. Compl. at 21-22; Pls.' Opp'n at 43 ("Each prong of the claim is satisfied under the proof set out above regarding the FCA.").  Plaintiffs may rest their claims for wrongful discharge on a constructive discharge theory under West Virginia law.  Similar to under the FCA, "'[i]n order to prove a constructive discharge [under West Virginia law], a plaintiff must establish that working conditions created by or known to the employer were so intolerable that a reasonable person would be compelled to quit. It is not necessary, however, that a plaintiff prove that the employer's actions were taken with a specific intent to cause the plaintiff to quit.'" *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419 n.2, 422 (W. Va. 1998) (quoting *Slack v. Kanawha County Housing and Redevelopment Auth.*, 423 S.E.2d 547 (W. Va. 1992)).

Here, the Court already has determined that both Plaintiff Smith and Plaintiff Barker failed to establish the causal link between their terminations from employment at MM and their participation in protected activity.  Accordingly, as with their retaliation claims under the FCA, Ms. Smith's and Mr. Barker's claims for wrongful discharge in violation of public policy under West Virginia law fail.  Similarly, the Court has concluded that Plaintiff Boone has failed to establish that she was constructively discharged from MM.  Given this finding, the Court also concludes that Defendant is entitled to summary judgment on Ms. Boone's state law claim. Finally, the Court held that Ms. Harris presented a genuine dispute of material facts such that a reasonable jury could conclude that she was constructively discharged from MM as a result of her report to the MM board.  As a result, Defendant is not entitled to summary judgment on Ms. Harris's claim for wrongful discharge in violation of public policy under West Virginia law.

Defendant is entitled to summary judgment on the state law claims related to Ms. Boone, Mr. Barker, and Ms. Harris.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendant's [70] Motion for Summary Judgment and GRANTS Plaintiffs' [95] Motion to File Surreply to Defendant's Reply Brief. Specifically, the Court GRANTS Defendant's motion with respect to: (1) Plaintiff Harris's claim under the FCA related to her alleged demotion; (2) Plaintiff Boone's claim under the FCA related to her alleged constructive discharge; (3) Plaintiff Barker's claim under the FCA related to his termination; (4) Plaintiff Smith's claim under the FCA related to her termination; and (5) Plaintiffs Boone's, Barker's, and Smith's claims for wrongful discharge in violation of public policy under West Virginia law. In all other respects, Defendant's motion is DENIED.

In conclusion, the Court DENIES summary judgment as to Plaintiff Boone's alleged demotion under the FCA, but GRANTS summary judgment as to Plaintiff Boone's alleged constructive discharge under both the FCA and state law. The Court DENIES summary judgment as to Plaintiff Barker's alleged demotion under the FCA, but GRANTS summary judgment as to Plaintiff Barker's termination from employment under the FCA and state law. Similarly, the Court DENIES summary judgment as to Plaintiff Smith's alleged demotion under the FCA, but GRANTS summary judgment as to Plaintiff Smith's termination from employment under the FCA and state law. Finally, the Court DENIES summary judgment as to Plaintiff Harris's alleged constructive discharge under both the FCA and state law, but GRANTS summary judgment as to Plaintiff Harris's alleged demotion under the FCA. Accordingly, the Plaintiffs' claims related to the alleged demotions of Plaintiffs Boone, Barker, and Smith under the FCA as well as the alleged constructive discharge of Plaintiff Harris under both the FCA and

state law survive Defendant's Motion for Summary Judgment. An appropriate Order accompanies this Memorandum Opinion.


Dated:  August 20, 2014

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge
